**Adella Chiminya TACHIONA, on her own behalf on behalf of her late husband Tapfuma Chiminya Tachiona, and on behalf of all others similarly situated, Efridah Pfebve, on her own behalf and on behalf of her late brother Metthew Pfebve, Elliot Pfebve, on his own behalf and on behalf of his brother Metthew Pfebve, Evelyn Masaiti, on her own behalf, Maria Del Carmen Stevens, on her own behalf, on behalf of her late husband David Yendall Stevens, and on behalf of all others similarly situated, Plaintiffs,**

v.

**Robert Gabriel MUGABE, in his individual and personal capacity, Zimbabwe African National Union–Patriotic Front, Stan Mudenge, Jonathan Moyo, and Certain Other Unknown Named Senior Officers of ZANU–PF, Defendants.**

**No. 00 CIV. 6666(VM).**

United States District Court, S.D. New York.

Oct. 30, 2001.

*DECISION AND ORDER*

MARRERO, District Judge.

## TABLE OF CONTENTS

 **PAGE**

BACKGROUND ..................................................................264

FACTS ........................................................................265

DISCUSSION ..................................................................268

 I. HEAD–OF–STATE IMMUNITY .........................................268

 A. ABSOLUTE SOVEREIGN IMMUNITY DOCTRINE: *THE SCHOONER EXCHANGE* ................................................................268

 B. RESTRICTIVE IMMUNITY ...........................................270

 1. The Tate Letter .......................................................270
 2. The Foreign Sovereign Immunities Act .................................272

3. Post–FSIA Effects and Development .......................................278
4. FSIA Case Law ...........................................................281
 a. *Chuidian* .........................................................281
 b. *Aristide* .........................................................284
 c. Beyond *Chuidian* and *Aristide* ..................................288
 d. Plaintiffs' Authorities Distinguished .............................293

II. **DIPLOMATIC IMMUNITY** ...............................................297

III. **PERSONAL INVIOLABILITY** ..........................................302

IV. **JURISDICTION** ................................................... .309

A. PERSONAL JURISDICTION .................................................309

B. SUBJECT MATTER JURISDICTION ..........................................309

 1. The Alien Tort Claims Act ..........................................313
 2. The Torture Victim Protection Act .................................315

V. **CONCLUSION** ........................................................316

**ORDER** ...............................................................318

Plaintiffs (hereinafter referred to collectively as "Plaintiffs") are citizens of Zimbabwe. They brought this suit as a class action in their own names and on behalf of other similarly situated Zimbabweans who Plaintiffs claim have suffered from wrongful actions they attribute to defendants. Plaintiffs' claims are lodged against Robert Gabriel Mugabe (hereinafter "Mugabe"), who is the President of Zimbabwe; Stan Mudenge (hereinafter "Mudenge"), Zimbabwe's Foreign Minister; and Jonathan Moyo, Minister for Information and Publicity of Zimbabwe; as well as against the Zimbabwe African National Union–Patriotic Front ("ZANU–PF"), the Zimbabwe government's ruling political party of which Mugabe is First Secretary and President, and Mudenge and Moyo are senior officers. As jurisdictional and substantive grounds for their action Plaintiffs invoke the Alien Tort Claims Act ("ATCA"),[1] the Torture Victim Protection Act ("TVPA"),[2] the general federal question jurisdictional statute,[3] and fundamental norms of international human rights law.[4]

## BACKGROUND

The principles at issue in this case hold ancient roots. They trace to a time when the concept of the sovereign embodied a dual meaning. It stood for both the abstract nation and the corporeal person of its ruler: the State was the monarch and the monarch was the State. The echoes of that notion resound most prominently in words that issue from the *ancien régime,* when perhaps not at all in haughty jest, but in a pointed reflection of then perceived reality, France's King Louis XIV, in his enduring remark "L'état, c'est moi", proclaimed the state and himself synonymous.

1. 28 U.S.C. § 1350.

2. Pub.L. 102–256, 106 Stat. 73 (Mar. 12, 1992) (codified at 28 U.S.C. § 1350 Note).

3. 28 U.S.C. § 1331.

4. *See* Compl. ¶¶ 10, 173, 179–83, 188, 193, 199, 204, 211; *see also infra* notes 206–42 and accompanying text.

Old ideas die hard. And so, the core of the controversy now before the Court tests the residual vigor of a political and legal legacy of sovereign antiquity. At issue is whether and to what degree the duality that was once assumed as a truism of sovereignty, as though emanating from divine right, may still survive as a binding equation in a doctrine of sovereign immunity for a foreign head-of-state that would preclude this Court, as the United States Government here urges, from extending jurisdiction over the foreign government leaders here, no matter how grievous or unofficial the wrongs they are called upon to answer.

Conversely, Plaintiffs advance a more expansive theory. In essence, they posit that the concept of sovereignty has evolved, and that with it the traditional principles governing sovereign immunity changed, the world of these ideas over time scooped by the arcs of new realities above them, yielding ground to a modern age that, both in symbol and in fact, has witnessed "Diadems drop, and Doges surrender."[5] According to this view, in the ensuing progress of events and enlightened principles, the Court may find enough support to ground its exercise of judicial power over the foreign officials here.

In the final analysis, as this Court concludes, the instant case is one in which hopes outpace remedy, personal demands for justice run higher than the availability of full and immediate legal recourse in this forum. The progression of the legal precepts and theories Plaintiffs here invoke, despite critical strides marked in recent years, still trails behind human aspirations and has some time and way to go to close the gap. Consequently, on the circumstances now before the Court, the measure of justice necessarily is gauged on a scale some may feel does not fully reckon all that is seen and unseen, and whose standards may account, perhaps disproportionately, for things not altogether discernible. Nonetheless, for the reasons described below the Court accepts the State Department's Suggestion of Immunity on behalf of Mugabe and Mudenge and dismisses the action as to them. Plaintiffs' motion for entry of a default judgment against ZANU–PF, however, is granted.

### FACTS [6]

■ The complaint asserts that the ZANU–PF led by President Mugabe and the other individual defendants acting in their personal capacities and as senior officers of ZANU–PF, planned and executed a campaign of violence designed to intimidate and suppress its burgeoning but peaceful political opposition, the Movement for Democratic Change ("MDC"). Specifically, Plaintiffs charge that defendants' lawless conduct included "murder, torture, terrorism, rape, beatings, and destruction of property ...."[7] For reasons discussed below and critical to the legal dispute at

---

**5.** Emily Dickinson, *The Poems of Emily Dickinson* 158 (Martha Dickinson Bianchi and Alfred Leete Hampson, eds.1930) (1890).

**6.** The statement of facts set forth below is based on the claims set forth in Plaintiffs' complaint and in the declarations of parties and witnesses, as well as exhibits submitted in support of Plaintiffs' Motion for Judgment by Default and their Answering Brief herein. *See* Compl.; Plaintiff's Answering Brief to the Suggestion of Immunity Submitted by the United States of America, dated Apr. 23, 2001 (hereinafter "Plaintiffs' Brief"); Declaration of Paul Sweeney in Support of Plaintiffs' Brief, dated Apr. 23, 2001 (hereinafter "Sweeney Decl."). The factual allegations detailed in these documents, in light of defendants' default, are deemed true for the purposes of this proceeding.

**7.** Compl. ¶ 15.

hand, Plaintiffs stress that the violent deeds associated with this campaign were all perpetrated by defendants and other agents of ZANU–PF acting individually, not by the government of Zimbabwe nor by Mugabe and Mudenge carrying out any public mandate or official duties. The complaint and supporting materials graphically depict acts of brutality this campaign inflicted upon its intended victims.

For present purposes, the Court accepts the uncontested assertions that the violence and wrongs Plaintiffs allege fall squarely within the conduct encompassed by the ATCA and TVPA and proscribed by universally recognized human rights norms.[8] On this basis, the Court adopts as findings of fact that, by reason of their support for the MDC, Tapfuma Chiminya, Metthew Pfebve, and David Stevens were all extrajudicially murdered; Metthew Pfebve and David Stevens were tortured; Efridah Pfebve and Evelyn Masaiti were attacked and beaten; and all of the named and unnamed Plaintiffs were in other ways terrorized by operatives of ZANU–PF operating in concert with or significantly aided by high-ranking Zimbabwe government officials acting under color of state law.

The actions taken against these individuals were part of an organized political campaign that occurred during the four-months preceding Zimbabwe's June 2000 Parliamentary elections. The violent drive was implemented, according to Plaintiffs, by ZANU–PF members who were trained and directed from the highest levels of ZANU–PF, and who acted pursuant to Mugabe's orders given through ZANU–PF's chain of command. Moreover, this effort was designed to intimidate all of ZANU–PF's political opposition through harassment, physical attacks and even assassination of targeted individuals.

The specific acts that comprise this conduct are set forth in considerable detail in the complaint and related documents in the record. For example, Plaintiffs assert that private individuals occupying a ZANU–PF vehicle attacked MDC members in a car on their way from filing a report with the police concerning a beating of another MDC member. After severely beating the three occupants of the car, the attackers then doused two of the occupants with gasoline and set them on fire. The ZANU–PF vehicle and the perpetrators remained at the scene while the victims burned. In addition, police officers in a vehicle nearby stopped at a distance and, though observing the MDC car in flames and the burning people, made no effort to stop the attack or the ZANU–PF vehicle when it fled from the scene. Instead, after the ZANU–PF vehicle had departed, the police sought, but were too late, to render assistance to the victims. One of the individuals who died in the attack was the late husband of the lead plaintiff in this case.

In support of their factual assertions, and as confirmation of the concerted violence and lawlessness portrayed by the incidents described in the complaint, Plaintiffs cite to contemporary international expressions of concern and condemnation of events in Zimbabwe. They point, for example, to a U.S. Senate bill passed in 2000 condemning the campaign of violence that the ZANU–PF had "orchestrated and supported," and that continued at Mugabe's "explicit and public urging".[9] Likewise, the European Parliament adopted a series of resolutions expressing concern over human rights abuses allegedly perpetrated by Mugabe and ZANU–PF and resolved to

---

**8.** *See infra* notes 206–42 and accompanying text.

**9.** Zimbabwe Democracy Act of 2000, S. 2677, 106th Cong. (2000) (enacted).

condemn "the sustained campaign of murder, violence, intimidation and harassment by President Mugabe and the ruling ZANU–PF Party against political opponents, farm workers, white farmers, and homosexuals."[10] This resolution also found that "the ongoing breakdown in the rule of law in Zimbabwe is the direct result of the renewed cycle of violence initiated by President Mugabe against his political opponents" and deplored the treatment of Zimbabwe's Chief Justice, who was forced into retirement, and death threats reported against other judges.[11] Plaintiffs also point to press reports[12] of these events, and to an Amnesty International finding that "[d]uring the election campaign leading up to the parliamentary elections in June 2000 a pattern of violations that included extrajudicial execution and torture emerged."[13]

Plaintiffs served Mugabe and Mudenge with their pleadings while the officials were in New York City attending a conference at the United Nations.[14] To avoid particular diplomatic immunity rules that apply within United Nations Headquarters Area,[15] Plaintiffs arranged to serve process outside the boundaries of that district. Specifically, Plaintiffs assert that they served Mugabe as he arrived at an unofficial gathering organized by a private New York group which reportedly raises money for defendants under the name "Friends of the ZANU–PF" and which has nothing at all to do with the United Nations or the United States government. According to Plaintiffs, Mugabe chose to speak at this unofficial function precisely in order to defend his actions in Zimbabwe; to galvanize support for ZANU–PF; and to lobby the American public in opposition to legislation then pending before the U.S. Senate condemning ZANU–PF's campaign of violence.

Defendants defaulted without any appearance before the Court. After Plaintiffs moved for entry of a default judgment, Mugabe and Mudenge submitted to the State Department a request for immunity. On February 23, 2001, the State Department responded by filing a Suggestion of Immunity on behalf of Mugabe and Mudenge. The Suggestion of Immunity asserts that the State Department informed the Department of Justice that the "Department of State recognizes and allows the immunity of President Mugabe and Foreign Minister Mudenge from this suit"[16] and that "permitting this action to proceed against the President and Foreign Minister would be incompatible with the United States' foreign policy interests."[17] In connection with the Suggestion, the Government now urges dismissal of Plaintiffs' claims against Mugabe and Mudenge, and an order quashing or nullifying service of process against them. The Government's request asserts three grounds in

---

10. Sweeney Decl., Ex. 2, Preamble A, D, F, G, ¶ 3.

11. *Id.*

12. *See* Sweeney Decl., Ex. 5, *60 Minutes* (CBS Broadcast, January 21 2001).

13. Sweeney Decl., Ex. 1 at 3.

14. The complaint also named Jonathan Moyo as a defendant. It appears that he was not personally served and Plaintiffs have not requested default judgment against him.

15. *See* 22 U.S.C. § 287 Note (Agreement Between The United Nations And The United States Of America Regarding The Headquarters Of The United Nations, Art. V, Section 15) (hereinafter the "Headquarters Agreement").

16. Suggestion of Immunity Submitted by the United States of America, dated February 23, 2001 (hereinafter the "Suggestion"), at 2–3.

17. *Id.* at 2.

support of this result: (1) head-of-state immunity; (2) diplomatic immunity; and (3) personal inviolability attaching to both Mugabe and Mudenge. These theories and Plaintiffs' responses are discussed in turn below.

## DISCUSSION

### I. HEAD-OF-STATE IMMUNITY

#### A. ABSOLUTE SOVEREIGN IMMUNITY DOCTRINE: THE SCHOONER EXCHANGE

One legal manifestation of the longstanding conceptual identity of ruler and state, conveying the personification of the sovereign nation in the head-of-state, is the traditional doctrine of absolute sovereign immunity. This theory held that unless the protection were expressly waived, the sovereign state, acting through its officers and agents, was not subject to the jurisdiction of the judiciary, at least for acts taken by government agents in an official capacity. In the context of foreign nations, this principle was given expression and recognition early in American jurisprudence by the Supreme Court's 1812 decision in *The Schooner Exchange v. McFaddon*,[18] a case which "came to be regarded as extending virtually absolute immunity to foreign sovereigns."[19] There, McFaddon, claiming to be the rightful owner of an armed merchant vessel in the service of France, sought a court order to attach the ship when it sailed into an American port. Chief Justice Marshall ruled that, under an implied grant of immunity by the United States, a public armed ship of a friendly foreign nation, though having entered territory of this country, was exempt from the exercise of jurisdiction of United States courts.

*The Schooner Exchange* elaborated four enduring principles which form the cornerstone of foreign sovereign immunity jurisprudence and are central to the resolution of the issues at hand. First, Chief Justice Marshall observed that the jurisdiction of a sovereign state within its own territory, which derives from the perfect equality and independence of every nation and of which the jurisdiction of its courts is a component, "is necessarily exclusive and absolute," subject to "no limitation not imposed by itself."[20]

Second, this full and absolute jurisdiction, an attribute of every sovereign, is incapable of conferring extra-territorial power and "would not seem to contemplate foreign sovereigns nor their sovereign rights as its objects," but by "common interest impel[s] them to mutual intercourse."[21] By this statement, *The Schooner Exchange* articulates the principles of comity and reciprocity which serve as the bedrock for the doctrine of sovereign immunity:

> One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belong-

---

18. 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812).

19. *Verlinden v. B.V. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (citing *Berizzi Bros. Co. v. Pesaro*, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926)); *see also Republic of Mexico v. Hoffman*, 324 U.S. 30, 34, 65 S.Ct. 530, 89 L.Ed.

729 (1945); *Ex Parte Peru*, 318 U.S. 578, 587–89, 63 S.Ct. 793, 87 L.Ed. 1014 (1943).

20. *The Schooner Exchange*, 11 U.S. (7 Cranch) at 136.

21. *Id.* at 137.

ing to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him.[22]

Third, all exceptions to the nation's exercise of jurisdiction within its territories "must be derived from the consent of the sovereign of the territory"[23], which consent may be expressed or implied. The Court then identifies three circumstances under which every sovereign, recognizing the common interest impelling mutual cooperation, is understood to waive a part of its absolute territorial jurisdiction: (1) the exemption of the person of the sovereign from arrest or detention within a foreign territory; (2) the immunity allowed to foreign ministers, ambassadors and other diplomats; and (3) the assent to the passage of foreign troops, a subset of which is the entry of friendly foreign naval ships into domestic ports. Noteworthy in this classification, and a vital point to which this Court returns below,[24] is the distinction Chief Justice Marshall draws between the exemption conferred upon the *person* of the sovereign to be free from arrest or detention while present within a foreign territory, and, as a separate category, the immunity of diplomatic ministers abroad.

Fourth, and of particular interest here, Chief Justice Marshall admitted to some potential limitation to both the traditional identity of the sovereign and ruler and to the absoluteness of the sovereign's immunity. He noted, without expressing an opinion, the difference between "the private property of the person who happens to be a prince, and that military force which supports the sovereign power, and maintains the dignity and the independence of a nation."[25] As regards the former, the Chief Justice makes an observation that presaged the basis and course for later changes in the law and anticipated disputes such as that now before this Court. He remarked:

> A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual.[26]

Significantly, reflecting the common understanding that then conflated the sovereign nation and its ruler, Chief Justice Marshall throughout the opinion refers to the state and the "prince" as one, and describes the state, anthropomorphically transfigured in the person of the sovereign prince, as "he" and "him".[27] Both doctrinally and in practice, because the sovereign and the head-of-state were deemed to be the same, the fusion translated into a principle of immunity that, under customary international law, developed and was recognized as similarly unitary and coextensive.[28] Prior to 1976, the case law and

22. *Id.*

23. *Id.* at 143.

24. *See infra* notes 141–46 and accompanying text.

25. *The Schooner Exchange,* 11 U.S. (7 Cranch) at 145.

26. *Id.*

27. *See, e.g., id.* at 137, 144 (referring to a public armed ship, the Court noted that it

"acts under the immediate and direct command of the sovereign; is employed by him in national objects. He has many and powerful motives for preventing those objects from being defeated by the interference of a foreign state. Such interference cannot take place without affecting his power and his dignity."); *see also supra* note 22 and quote in accompanying text.

28. *See, e.g., Restatement (Second) of Foreign Relations Law* § 65, *et seq.* (1965). According to the Restatement § 66, the definition of

commentary record very few, if any, instances in which a claim for exercise of jurisdiction over a head-of-state was asserted personally against the ruler of a nation, separate and apart from the sovereign state the leader personified.[29]

## B. *RESTRICTIVE IMMUNITY*

### 1. *The Tate Letter*

The theory of absolute sovereign immunity, incorporating the conceptual unity of sovereign and ruler that *The Schooner Exchange* articulated, served as controlling principle in foreign state immunity controversies in this country until 1952. As the doctrine was ultimately formulated by the Supreme Court,

> "it is a guiding principle in determining whether a court should exercise or surrender its jurisdiction [in actions against foreign states], that the courts should not act as to embarrass the executive arm in its conduct of foreign affairs. 'In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction.' " [30]

Thus, upon a formal assertion by the Executive Branch that a foreign state or entity sued in the United States was entitled to sovereign exemption from jurisdiction, the courts were obligated to honor the total immunity that recognition conferred and to dismiss the action.[31]

By 1952 several developments had converged to bring about substantive change away from the absolute sovereign immunity doctrine. Following significant increases in international commerce and changes in state economic systems that occurred after World War II, many countries altered their foreign relations practices to conform to a restrictive theory of sovereign immunity.[32] Under this approach, an exception to state immunity was carved for foreign sovereign activities that were strictly commercial, thus limiting the absolute exemption from exercise of national jurisdiction over foreign states solely to disputes arising from public actions inherently within the sphere of governmental functions.

The change was prompted partly in response to the rapid rise in the number of countries that had adopted socialist or communist governments that nationalized major industries and conducted interna-

head of state equated to that the state itself "The immunity of a foreign state under the rule stated in section 65 extends to ... its head of state and any person designated by him as a member of his official party..." Immunity under § 65 applied to: "(a) the state itself; (b) its head of state...; (c) its government or any governmental agency; (d) its head of government...; (e) its foreign minister...; (f) any other public minister, official or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state...; (g) a corporation created under its laws and exercising functions comparable to those of an agency of the state."

**29.** *See Lafontant v. Aristide,* 844 F.Supp. 128, 136 (E.D.N.Y.1994); *see also* Lord Gore-

Booth, *Satow's Guide to Diplomatic Practice* 9 (Lord Gore–Booth ed., 5th ed.1975) (hereinafter *"Satow's Guide"*); Jerrold L. Mallory, *Resolving the Confusion Over Head of State Immunity: The Defined Rights of Kings,* 86 Colum. L.Rev. 169, 170–73 n. 10 (1986) (hereinafter "Mallory").

**30.** *Hoffman,* 324 U.S. at 35, 65 S.Ct. 530 (quoting *United States v. Lee,* 106 U.S. 196, 209, 1 S.Ct. 240, 27 L.Ed. 171 (1882) and *Ex Parte Peru,* 318 U.S. at 588, 63 S.Ct. 793).

**31.** *See id.*

**32.** *See Alfred Dunhill of London v. Republic of Cuba,* 425 U.S. 682, 701–02 n. 15, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

tional commerce through state-owned or controlled entities.[33] These means of trade produced competitive disadvantages and resulting injustices for other states and private parties that engaged in commerce with state-dominated enterprises. For example, in litigation arising from commercial disputes over the non-performance of contracts or other wrongful conduct, it became commonplace for these entities to hide behind the near-fiction that they were the state, and to assert sovereign immunity as an absolute defense, thereby erecting a shield against all liability for their obligations and damages.[34]

In the United States, a doctrinal watershed occurred in 1952 with the Department of State's promulgation of a new policy enunciated in a communication to the Justice Department. The Tate Letter, as it was called, put other nations on notice that the United States, in considering foreign governments' requests for sovereign immunity, would thereafter follow the restrictive theory of sovereign immunity.[35] The Tate Letter explicitly declared that the decisive considerations impelling the policy shift comprised two elements: the increasing practice on the part of (1) governments engaging in (2) commercial activities.

These developments made necessary a means to enable persons doing business with state enterprises "to have their rights determined in the courts." [36] Significantly, neither the Tate Letter, nor other authority then reflecting on generally prevailing practice or customary international law, made mention of controversies involving claims of individual immunity for sovereigns, represented in the person of the country's ruler, from the jurisdiction of the courts over matters relating to non-governmental transactions, commercial or otherwise, undertaken in their private or public capacities.[37]

In practice, the State Department implemented the modified policy by issuing guidance, in the form of "suggestions of immunity", in particular court cases in which the United States deemed its intervention appropriate. In those cases, the courts, in accordance with the Supreme Court's mandate in *Ex Parte Peru*,[38] uniformly deferred to the Executive Branch's assertions as conclusive on judicial determinations of foreign state immunity.

But the practical application of the Tate Letter policy and the results it yielded proved unsatisfactory. The distinction between a state's commercial activities and strictly governmental functions was not al-

---

33. *See generally id.*

34. *See, e.g., id.* at 700–03, 96 S.Ct. 1854; *The Katingo Hadjipatera,* 40 F.Supp. 546 (S.D.N.Y.1941).

35. *See* Letter from Jack B. Tate, Acting Legal Adviser of the United States Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dep't State Bull. No. 678 at 984 (June 27, 1952) (hereinafter the "Tate Letter").

36. *Id.; see also Verlinden,* 461 U.S. at 487, 103 S.Ct. 1962 (noting that in the theory of restrictive immunity adopted by the United States by means of the Tate Letter "immunity is confined to suits involving foreign sovereign's public acts, and does not extend to

cases arising out of a foreign state's strictly commercial acts").

37. *See* Joseph W. Dellapenna, *Head–of–State Immunity—Foreign Sovereign Immunities Act—Suggestion by the Department of State,* 88 Am. J. Int'l L. 528, 529 (July 1994) (hereinafter "Dellapenna") (noting the absence of precedent prior to the enactment of the Foreign Sovereign Immunities Act in 1976 for a doctrine of immunity for foreign heads-of-state as distinct from sovereign immunity for the state generally); *see also* Mallory, 86 Col. L.Rev. at 171.

38. 318 U.S. at 578, 63 S.Ct. 793.

ways clear. Often, the State Department's immunity determinations were not based on consistent or coherent standards, nor on established internal adjudicatory procedures. At times these determinations worked to the State Department's own embarrassment; to the displeasure of the private and public commercial interests sacrificed to diplomatic and political considerations; or to the growing discomfort and uninhibited consternation of the courts.[39] State Department "suggestions" often were issued on the basis of the foreign government's political and diplomatic pressures on the Executive Branch and similar situations yielded different outcomes.[40] Moreover, the courts were left without objective rules of law to apply in cases where the foreign state did not request immunity, or the State Department chose not to intervene.[41] As a consequence, sovereign immunity determinations were made by two branches of the government based on varying standards and considerations not always clearly compatible or uniformly applied.[42] The perceived politi-

cization of the sovereign immunity process engendered mounting concern all around.

### 2. *The Foreign Sovereign Immunities Act*

 General dissatisfaction with application of the Tate Letter's policy change motivated the passage of the Foreign Sovereign Immunities Act of 1976 (the "FSIA" or the "Act").[43] The statute, intended to adopt "comprehensive rules governing sovereign immunity",[44] embodied two major objectives. It established as United States foreign relations practice the restrictive doctrine of sovereign immunity enunciated in the Tate Letter, thereby strictly limiting foreign states' immunity from the jurisdiction of United States courts to actions grounded on public or governmental functions. Accordingly, the Act denied sovereign immunity to foreign public entities for disputes arising out of their commercial ventures that are no different from ordinary private business transactions. The FSIA's major departure was its removal of the State Department's former role in the foreign state immunity process: it trans-

---

**39.** *See, e.g., Jet Line Servs., Inc. v. M/V Marsa El Hariga,* 462 F.Supp. 1165, 1169 (D.Md. 1978).

**40.** *See generally* Shoba Varughese George, *Head of State Immunity in the United States Courts: Still confused After All These Years,* 64 Fordham L.Rev. 1051, 1058–59 (Dec.1995) (hereinafter "George").

**41.** *See* Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcommittee on Administrative Law, and Governmental Relations of the House Committee on the Judiciary, 94th Cong., 2d Sess. 24, 27 (1976) (hereinafter "Hearings on H.R. 11315"); *see also Verlinden,* 461 U.S. at 487–88, 103 S.Ct. 1962; George, 64 Fordham L.Rev. at 1058–59.

**42.** *See Verlinden,* 461 U.S. at 487–88, 103 S.Ct. 1962.

**43.** *See* 28 U.S.C. § 1603. In the principal report reciting the Act's legislative history,

Congress noted that the Tate Letter had "posed a number of difficulties. From a legal stand point, if the Department applies the restrictive principle in a given case, it is in the awkward position of a political institution trying to apply a legal standard to litigation already before the courts .... From a foreign relations standpoint, the initiative is left to the foreign state .... From the standpoint of the private litigant, considerable uncertainty results. A private party who deals with a foreign government entity cannot be certain that his legal dispute with a foreign sovereign will not be decided on the basis of nonlegal considerations through the foreign government's intercession with the Department of State." H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 8–9 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6607 (hereinafter the "H.R. Report").

**44.** H.R. Report, at 12; *Verlinden,* 461 U.S. at 495 n. 22, 103 S.Ct. 1962.

ferred "the determination of sovereign immunity from the executive branch to the judicial branch." [45]

Like the Tate Letter whose policy shift it codified, the intent of the FSIA as manifested in its text and legislative history evinces preoccupation with "commercial activities" of "foreign states" and with according protection to corresponding interests of litigants who have dealings, and are engaged in legal disputes, with a "foreign government entity." [46] Instructive in conveying the distinction expressed during Congress' deliberations on the FSIA is the testimony on behalf of the Executive Branch by a witness from the Department of Justice. Describing how the proposed legislation would operate to permit suits in United States courts against foreign state-owned entities—such as Lufthansa, West Germany's national airline—that were engaged in ordinary commercial activities, he clarified that: "Now we are not talking, Congressmen, in terms of permitting suit against the Chancellor of the Federal Re-

public ... [t]hat is an altogether different question." [47]

That overarching concern with a foreign state's ordinary commercial transactions is given expression in the FSIA's text and legislative record in several ways. First, in its legislative findings, Congress declared that "the determination by United States courts of the claims of *foreign states* to immunity would serve the interests of justice and would protect the rights of both *foreign states* and litigants in United States courts." [48] Further, Congress noted that under international law "*states* are not immune from the jurisdiction of foreign courts insofar as their *commercial activities* are concerned .... [C]laims of *foreign states* to immunity should henceforth be decided by courts of the United States... in conformity with the principles set forth in [the Act]." [49] In this connection, substantial deliberation in the drafting and debate was devoted to the legal and practical difficulties encountered in defining and distinguishing between public and private commercial activities. [50]

45. H.R. Report, at 7; *see also Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1100 (9th Cir.1990) ("[t]he principal change envisioned by the statute was to remove the role of the State Department in determining immunity"); *Republic of the Philippines v. Marcos,* 665 F.Supp. 793, 797 (N.D.Cal.1987) ("The power of the executive to determine when courts may exercise jurisdiction over foreign sovereigns has been abolished ...."); *but cf. Lafontant v. Aristide,* 844 F.Supp. at 136; *supra* notes 107–13 and accompanying text.

46. *See* George, 64 Fordham L.Rev. at 1075 n. 193 (citing H.R. Report, at 15–16 for examples of the kinds of "agencies or instrumentalities" that generated the FSIA's concerns: "state trading companies, mining enterprises, airlines, steel companies, central banks, export associations, government procurement agencies, and ministries").

47. Immunities of Foreign States: Hearing on H.R. 3493 Before the Subcomm. on Claims and Governmental Relations of the House

Comm. on the Judiciary, 93d Cong., 1st Sess. 16 (1976) (statement of Bruno Ristau, Chief, Foreign Litigation Unit, Civil Division, Department of Justice).

48. 28 U.S.C. § 1602 (emphasis added).

49. *Id.* (emphasis added).

50. *See* Hearings on H.R..11315, at 53 (recording the State Department Legal Advisor's observation that: "We realize that we probably could not draft legislation which would satisfactorily delineate that line of demarcation between commercial and governmental. We therefore thought it was the better part of valor to recognize our inability to do that definitively and to leave it to the courts with very modest guidance. For example, the courts would inquire whether the activity in question is one which private parties ordinarily perform or whether it is peculiarly within the realm of governments.").

Second, the integral connection of the immunity exclusions to both "commercial activities" and "foreign states" is further underscored by the Act's language defining "foreign state." The context the statute reflects is couched in words imbued with commercial purpose and usage. The term "foreign state" is meant to encompass an "agency or instrumentality of a foreign state", which in turn is defined as any entity "(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political division thereof." [51] Apparently, Congress intended this definition to be exclusive. The House Subcommittee, in its report on the bill, indicated "an entity which does not fall within the definitions of § 1603(a) or (b) would not be entitled to sovereign immunity in any case before a Federal or State Court." [52]

Third, the Act adopts several specific exemptions as to which, depending on the particular activity, "a foreign state" would no longer be entitled to assert immunity from the jurisdiction of courts in the United States. With regard to the commercial exception, it provides that sovereign immunity is not available in any case

in which the action is based upon a *commercial activity* carried on in the United States *by the foreign state;* or upon an act performed in the United States in connection with a *commercial activity of the foreign state* elsewhere; or upon an act outside the territory of the United States in connection with a *commercial activity of the foreign state* elsewhere and that act causes a direct effect in the United States. [53]

In determining the scope of commercial activity the Act contemplates that the nature of such activity "shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." [54]

The FSIA also created an exception applicable to certain torts encompassing actions

in which money damages are sought *against a foreign state* for personal injury or death, or damage to or loss of property, occurring in the United States and *caused by* the tortious act or omission of *that foreign state* or of any official or employee of *that foreign state* while acting within the scope of his office of employment [55].

Fourth, Congress evidenced concern that United States sovereign immunity practice "conform to the practice in virtually every other country." [56] The theory and practice of foreign state immunity then understood by the community of nations and applied as customary international law, similarly reflected paramount concern over foreign entities' commercial activities and embodied rules empirically deriving from and addressing that context. [57]

---

51. 28 U.S.C. § 1603. *See supra* note 46 for examples of the types of state entities contemplated by the Act.

52. *See* H.R. Report, at 15.

53. 28 U.S.C. § 1605 (emphasis added).

54. 28 U.S.C. § 1603(d).

55. 28 U.S.C. § 1605(a)(5).

56. H.R. Report, at 7.

57. *See* 28 U.S.C. § 1602; Tate Letter, 26 Dep't State Bull. at 984; *Satow's Guide* at 9 ("As regards the immunities of the foreign state itself, many states have developed complex and detailed rules under which these immunities are restricted in cases which may be broadly described as 'commercial'."); George, 64 Fordham L.Rev. at 1057.

Finally, language in the legislative history indicates that Congress intended to devise rules to resolve claims of sovereign immunity of foreign states without in any way affecting established practice governing suits involving diplomatic or consular representatives.[58]

Palpably absent from the FSIA legislative history and prior practice is any specific reference to the particular issues in contention before this Court: (1) the scope of FSIA jurisdictional exemption, if any, intended to reach: (a) individuals, as opposed to state "agencies or instrumentalities", in particular, (b) the head-of-state, as distinct from the state itself; (c) private unofficial acts, as distinguished from actions attributable to the foreign state taken by government officials within the scope of their public duties; (d) private conduct of non-state persons or entities with which the head-of-state or other high ranking government leaders may be affiliated; and (2) as regards consideration of the foregoing issues, the extent of any remaining role the Department of State may play in suggesting foreign sovereign immunity in actions before the courts, and the effect the courts should accord to such expressions of interest made on behalf of the Executive Branch.

In fact, during the fifteen years that spanned the issuance of the Tate Letter and the enactment of the FSIA the bulk of sovereign immunity litigation recorded, not only in United States courts but in other countries, entailed commercial disputes involving foreign state public entities.[59] In a compilation of sovereign immunity decisions covering this period, the State Department reported only two instances in which immunity determinations related specifically to suits brought against heads-of-state.[60] And the limited precedent that did exist may suggest that the sovereign officials there may have been named routinely, either for tactical pleading purposes or as surrogates for the state itself.[61]

In this precedential void, as Plaintiffs here acknowledge, the courts, on the few occasions in which the principle of sovereign immunity was asserted in connection with an action filed against a head-of-state, regarded the conceptual issue as subsumed within the recognized principle of absolute sovereign immunity for states and governed by *The Schooner Exchange* doctrine. This treatment suggested the existence of a unified theory of sovereign immunity integrating the traditional notion that the sovereign and its ruler were one and the same, concepts that had not yet branched into distinct doctrines subject to their own separate policies, standards and applications.[62]

---

58. *See* H.R. Report, at 21.

59. *See Dunhill*, 425 U.S. at 702, 96 S.Ct. 1854 (noting the "enormous increase in the extent to which foreign sovereigns had become involved in international trade"); *see also Victory Transp., Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 356 (2d Cir.1964).

60. *See* Mallory, 86 Colum. L.Rev. at 175 n. 26 (citing report in 1977 Dig. U.S. Prac. Int'l L. 1017).

61. *See id.; see also* Dellapenna, 88 Am.J. Int'l L. at 530 ("The practice in courts abroad was

only somewhat more finite than these few American precedents, although the foreign decisions are hardly more numerous.").

62. *See, e.g.,* Dellapenna, 88 Am. J. Int'l L. at 529 (noting that cases involving foreign heads of state were generally decided by courts granting absolute immunity as derived from the recognized strands of state immunity and diplomatic immunity: "There was no precedent for a doctrine of substantive immunity for foreign heads of state (as distinct from the doctrine of sovereign immunity generally) until after the enactment of the [FSIA]."); George, 64 Fordham L.Rev. at 1055 ("Historically, sovereign immunity for states and

The courts' view in this country was indeed consistent with prevailing norms and practices then accepted abroad as customary international law. One leading authority, referencing the growing volume of precedents and detailed rules reflecting restrictions promulgated by governments to limit claims of foreign state immunity, noted: "[b]ut none of this large and complex body of international law has been drawn up with the position of heads of state in mind." [63]

The central issue left unaddressed by legislative history is the one the parties before the Court here argue: whether the FSIA adopted an integrated doctrine of foreign state immunity, rescinding in its entirety and in all cases the practice of court deference to the State Department's intercessions, or whether a distinct branch of absolute immunity applying uniquely to heads-of-state survived the Act. To this Court, the dearth of pre-FSIA authority distinctly addressing head-of-state immunity casts substantial doubt over the proposition that in enacting the FSIA Congress intended to enunciate a far-reaching substantive redirection of United States international relations policy in the form of a uniform rule of law to govern all assertions of foreign immunity, including head-of-state immunity. At the time of the FSIA's

adoption, no widely accepted international practice established a separately standing principle of head-of-state immunity. In fact, prior to 1976 the doctrine of sovereign immunity was generally understood to encompass solely state immunity. Consequently, any reference to a head-of-state immunity "doctrine" as a concept distinct from foreign state immunity is a construct that does not arise in the case law and commentary as a specifically identified and widely recognized legal principle until after 1976.[64]

Thus, for Congress to have purposefully codified a head-of-state immunity rule would have required application of the FSIA to unique circumstances that were then relatively unencountered and undefined, not only domestically but abroad. To that degree such a pronouncement by Congress would have constituted a significant unilateral departure from international practice that, if so considered and designed would hardly have gone unnoticed and unmentioned by other governments.

Authorities recognize that the growth of international law is evolutionary. It expands by accretion as consensus develops among nations around widely recognized customs, practices and principles, and not by patchwork elevation of any one coun-

heads-of-states immunity were considered one and the same.").

**63.** *Satow's Guide* at 9; *see also* Mallory, 86 Colum. L. Rev at 177 ("While a survey of the international community's approach to head of state immunity reveals wide agreement that heads of state are entitled to some immunity, there is no consensus on the extent of that immunity."). In the United Kingdom, the State Immunity Act, which was enacted in 1978 and serves as the model for similar legislation in other British Commonwealth countries, the law defines a foreign state as including the head-of-state and head-of-government and related entities. *See* State Immunity Act, 1978, 26 & 27 Eliz. 2, Ch. 33, § 14(1), *reprinted in* 17 I.L.M. 1123, 1127–29

(1978) (hereinafter the "State Immunity Act"). The British Act also confers upon heads-of-state the protections of diplomatic immunity by applying to them the Diplomatic Privileges Act of 1964, 12 & 13 Eliz. 2, Ch. 81. State Immunity Act, § 20. *See* Mallory, 86 Colum. L.Rev. at 178 n. 33. In France, heads-of-state are accorded more extensive immunity comparable to that granted to diplomatic representatives. *See id.* at 177.

**64.** *See* Dellapenna, 88 Am. J. Int'l L. at 529–30 (noting that prior to the FSIA "We should perhaps refer to the supposed substantive immunity of foreign heads of state as having been more of a notion than a doctrine.").

try's ad hoc pronouncements.[65] Thus, any dramatic deviation from accepted international norms legislated by any single state without reference to widely accepted customary rules would be inconsistent with this principle. Chief Justice Marshall articulated this notion, also in *The Schooner Exchange:*

> A nation would justly be considered as violating its faith, although that faith might not be expressly plighted, which should suddenly and without previous notice, exercise its territorial powers in a manner not consonant to the usages and received obligations of the civilized world.[66]

With a legislative record devoid of any explicit contrary expression, a deliberate purpose to depart from generally prevalent international customs and practices as regards immunity for heads-of-state should not be ascribed to Congress.

The substantial disarray and division in the courts' practice following the enactment of the FSIA still prevails regarding the treatment accorded to head-of-state immunity and various other related issues emanating from the Act. In fact, the Second Circuit and other courts concur only in that "[t]he scope of this [head-of-state] immunity is in an amorphous and undeveloped state."[67] In this Court's reading of relevant precedent, it thus would be an overstatement to say that Congress could have envisioned legislating to address a situation whose inherent problems, complexities and exact dimensions were not known or fully comprehended at the time.

Since 1976, however, some conceptual fissures have separated the ancient notion that equated the head-of-state to the state itself. There is now growing recognition that the sovereign is solely the state and that the nation's ruler is a distinct entity.[68] In this regard, substantial case law has begun to develop, identifying issues singularly associated with head-of-state immunity and demanding treatment under a set of rules reflecting that uniqueness. But the courts are still grappling with the definition and scope of that doctrinal separation. Neither a clear consensus nor a controlling standard that can be considered to reflect customary international law has emerged

---

**65.** *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 434–35, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Filartiga v. Pena–Irala,* 630 F.2d 876, 880–81 (2d Cir.1980).

**66.** 11 U.S. (7 Cranch) at 137.

**67.** *In re Doe v. United States,* 860 F.2d 40, 44 (2d Cir.1988) (citation omitted); *see also In re Grand Jury Proceedings, John Doe # 700,* 817 F.2d 1108, 1110 (4th Cir.1987) (the "exact contours of head-of-state immunity . . . are still unsettled").

**68.** *See Republic of the Philippines v. Marcos,* 862 F.2d 1355 (9th Cir.1988), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989) (holding that Marcos's illegal acts were not official acts pursuant to his authority as President of the Philippines, the court stated Marcos "was not the state, but the head of state, bound by the laws that applied to him"); *Jimenez v. Aristeguieta,* 311 F.2d 547, 557 (5th Cir.1962) ("Even though characterized as a dictator, appellant was not himself the sovereign—government—of Venezuela within the Act of State Doctrine. He was chief executive, a public officer, of the sovereign nation of Venezuela."); *see also United States v. Noriega,* 746 F.Supp. 1506, 1522 (S.D.Fla.1990); *Satow's Guide,* at 9 ("A clear distinction is drawn in the law of many states, and implied in that of others, between the foreign state as a legal entity and the head of state of such state as an individual to whom a very high degree of privilege and immunity remains due."); Mallory, 86 Colum. L.Rev. at 197 n. 10 ("Today heads of state are no longer viewed as the actual state, although in some cases they are regarded as personification of the state. States and the rulers are separate entities; states, not their rulers, are generally viewed as the primary subjects of international law.").

from the courts' consideration of those issues.

### 3. *Post–FSIA Effects and Developments*

A substantial increase in litigation brought against foreign states was recorded after the FSIA's enactment.[69] This development may have been a by-product not only of cases engendered by the clarifying rules the Act promulgated, but of the continuing rise in foreign trade conducted by states and their public entities. A phenomenon of particular significance to the action at bar is noteworthy in this post-FSIA trend: the substantial incidence of claims asserted directly against heads-of-states, as opposed to the state itself, often relating to conduct alleged to be personal and unconnected with any governmental duties.[70]

Three circumstances may explain this development. First, some plaintiffs, aware that suits naming the state directly are explicitly barred by the FSIA, either for tactical effect or to test the substantive contours of the Act's exceptions, have sought to assert theories of liability that extend to foreign officials not only as "agencies or instrumentalities" of the state, but in their personal capacities.[71] Second, as international trade and opportunities to expand wealth in global markets has continued to expand, more heads-of-state themselves may be engaging in private foreign investment and commercial ventures funded by their personal and family fortunes.[72]

A third phenomenon, of more recent roots, is closer on point. Increasingly, the world's nations have come to give recognition and legal expression to new realities about the actions of state officials. These concerns have taken front-stage roles in international relations. Many major crimes and sources of personal injuries, such as genocide, acts of terrorism and abuses of human rights, honor no bounds of decency, and respect no national borders. People and the nations they comprise are more conscious that, like the effects of subterranean faults, violations of international law and state denials of universally recognized fundamental liberties in one country can reverberate harmfully in others.

As a by-product of this greater awareness, a deeper wedge has been driven in the old sovereign equation, in recognition that it is not the "state" as a collective abstraction, but rather live persons, with or without the badge of the state, who commit atrocities in violation of common norms, and that high-ranking government officials, even heads-of-state themselves, may be among the persons prone from time to time to indulge in lawlessness. Finally, to address these concerns and changing circumstances some adjustments in the practices governing relations among states became necessary. To these ends, a considerable body of new rules emerged, both domestically and internationally, in large measure during the years soon after

---

**69.** *See* Dellapenna, 88 Am. J. Int'l L. at 531.

**70.** *See id.* ("In the upsurge of litigation against foreign states and foreign-state-related entities in the United States that followed the enactment of the Foreign Sovereign Immunities Act in 1976, a rather remarkable number of suits (given prior dearth of such suits) was filed against heads of foreign states.").

**71.** *See, e.g., Chuidian*, 912 F.2d at 1106; Dellapenna, 88 Am. J. Int'l L. at 530.

**72.** *See, e.g., First Am. Corp. v. Al–Nahyan*, 948 F.Supp. 1107, 1112–13 (D.D.C.1996); *Lasidi, S.A. v. Financiera Avenida, S.A.*, No. 5864/52 (N.Y.Sup.Ct.) (hereinafter *"Lasidi"*) (as reported by David Berrely, *Missing Millions*, Nat'l L.J., August 29, 1983 at 1).

the enactment of the FSIA.[73]

As a consequence, with greater incidence, foreign state officials are accused of wrongful conduct arising not just from private commercial ventures, but from alleged criminal activity and abuses of human rights in violation of customary international law.[74] In fact, the broad body of substantive law and behavior constituting recognized violations of international norms, which correspondingly has given rise to claims such as the one at bar for enforcement of those rights, has expanded significantly in more recent years.[75]

Concomitant with the increase in the body of law defining rights, is another related major development. Efforts to define the concept of international crime and the reach of human rights, and to hold violators accountable, would amount to no more than emblematic gestures unless those reforms were accompanied by a corresponding dismantling of the long-standing doctrinal bastions that have impeded the exercise of domestic and international jurisdiction over state officials for violation of the new standards. And in fact, just such relaxation of the old barriers has occurred; material chips have been scored in the ramparts foreign government agents once routinely erected as absolute defenses against litigation challenging their private conduct as crimes against humanity or other egregious abuses of human rights contravening international norms.[76] The world's nations, through treaties, conventions and declarations, have established standards defining as violations of customary international law, practices such as genocide, crimes against humanity, torture, forced disappearance, extra-judicial killings and terrorism.[77]

To promote enforcement of these standards, the international community has mobilized in establishing mechanisms, modeled after the Nuremberg War Crimes Tribunal following World War II, such as the International Criminal Tribunals for the Former Yugoslavia and for Rwanda created by the United Nations.[78] Most

73. *See infra* notes 76–85 and accompanying text.

74. *See* George, 64 Fordham L.Rev. at 1051–52, 1054; Dellapenna, 88 Am. J. Int'l L. at 529–31.

75. *See id.*

76. *See, e.g.,* Rome Statute of the International Criminal Court, July 17, 1998, art. 27 (hereinafter "Rome Statute of the I.C.C.") ("This Statute shall apply to all persons without distinction based on official capacity as Head of State or Government, a member of a Government or parliament, an elected representative or a government official shall in no case exempt a person from criminal responsibility under this Statute, nor shall it, in and of itself, constitute a ground for a reduction of sentence.").

77. *See, e.g.,* The Convention on the Prevention and Punishment of the Crime of Genocide, December 9, 1948 78 U.N.T.S. 277 *entered into force* Jan. 12, 1951, *ratified by the United States effective* Feb. 23, 1989; Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, 23 I.L.M. 1027 (1984), *as modified,* 24 I.L.M. 535 (1985), *entered into force* June 26, 1987, *ratified by the United States effective* Oct. 21, 1994, 34 I.L.M. 590 (1995) (hereinafter the "Convention Against Torture"); *see also* Restatement (Third) of Foreign Relations Law, Pt. 2.

78. *See* S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th Mtg., U.N. Doc. S/INF/49 (1993) (the Yugoslavia Tribunal); S.C. Res. 955, U.N. SCOR, 49th Sess., 3453rd mtg., U.N. Doc. S/INF/50 (1994) (the Rwanda Tribunal). The Tribunals' prosecution of sitting and former heads-of-state and high-ranking government officials, for genocide, crimes against humanity and other violations of international law attest to the remarkable recent strides and the far-reaching implications of these developments in fostering the establishment of international legal norms. The Yugoslavia and

**280**

recently, they adopted the statute of the International Criminal Court.[79] The United States itself has joined in some of these developments by ratifying the Convention Against Torture in 1994 and enacting the TVPA in 1991 that empowered victims to file suits against acts of official torture and extrajudicial killings occurring in foreign states.[80] Judicially, in 1980, the Second Circuit infused vitality into the ATCA,[81] which had lain dormant on the books from virtual desuetude since 1789. In *Filartiga*,[82] the Court of Appeals construed the law as "opening the federal courts for adjudication of the rights already recognized by international law,"[83] and held that "an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations."[84]

The net results of these developments bear upon the issues before this Court.

They have caused some breach in the theoretical walls that once absolutely impeded the exercise of national jurisdiction against heads-of-state and other foreign officials for private conduct that violates clear and unambiguous norms of established international law. As a consequence, it has become harder for foreign officials accused of egregious personal misdeeds contravening customary international standards to find escape holes in which to crawl in flight from the arm of international law and its associated implementing domestic statutes. Private parties in rising numbers, such as Plaintiffs here, thereby have been encouraged to institute claims against such foreign state officials asserting damages caused by their personal derelictions. Importantly, to some degree, progression in the international sphere either mirrors or has been driven by comparable evolution of principles on the domestic front. For,

---

Rwanda Tribunals, though creatures of U.N. Security Council resolutions, both have been legitimized, by way of implementing legislation, as playing an important role in the legal machinery of the United States for the Tribunals' specified purposes. *See* Judicial Assistance to the International Tribunal for Yugoslavia and to the International Tribunal for Rwanda, Pub.L. No. 104–106, 110 Stat. 186, 485 (1996).

As such, the Tribunals bear the imprimatur of both international consensus and domestic implementing legislation. In this respect, the Tribunals' mandates, functions and sources of authority are altogether different from those of a federal district court exercising its circumscribed authority in a civil matter pursuant to its grant of limited jurisdiction in Article III. of the United States Constitution. Federal court jurisdiction cannot lay claim to genesis from international consensus nor to legislation that specifically authorizes all of the relief Plaintiffs seek here. Furthermore, recognizing that the Court's authority is constitutionally derived reinforces the delicate balance that exists between the judiciary and Executive Branch in matters of foreign relations.

79. *See* Rome Statute of the ICC, art. 27.

80. Pub.L. 102–256, 106 Stat. 73 (codified at 28 U.S.C. § 1350 Note).

81. 28 U.S.C. § 1350.

82. *Filartiga v. Pena–Irala*, 630 F.2d 876, 887–89 (2d Cir.1980); *see also Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1996) (declaring subject matter jurisdiction existed under the ATCA and TVPA in an action against the purported head-of-state of the Bosnian–Serb entity for acts of genocide, torture and other violations of international law); *Xuncax v. Gramajo*, 886 F.Supp. 162 (D.Mass.1995) (applying the ATCA to acts ascribed to Guatemala's Defense Minister); *Noriega*, 746 F.Supp. at 1506 (United States took unilateral action to capture Panama's dictator in Panama and prosecute him in the United States, on accusations of trafficking in narcotics in violation of United States criminal statutes, which were applied to punish the extra-territorial effects of Noriega's conduct).

83. *Filartiga*, 630 F.2d at 887.

84. *Id.* at 880.

inroads have been recorded against the absolute immunity from suit that heads-of-state once enjoyed at home.[85]

Nonetheless, many of these developments are incipient and still relatively modest. Whatever the trend, and however heartening it may be to the victims of gross brutality and to the human spirit's yearnings and strivings for justice, this progress by no means signifies, as confirmed by the intense arguments Plaintiffs and the Government advance before this Court, that a body of widely recognized principles exists, either in this country or internationally, clearly delimiting the bounds within which private claims against foreign heads-of-state and other high officials may be prosecuted in national courts. In this formative environment, agreement may exist with regard to one general proposition: that developments in the criminal context, whether concerning former or sitting government leaders, have advanced more definitively than the parameters defining permissible jurisdiction over sitting heads-of-states extending to personal conduct in civil matters.

### 4. FSIA Case Law

The conceptual distance that still exists between human expectations and the law's bestowals in relation to the international concepts here at issue is best illustrated by two conflicting camps into which construction and application of the FSIA have branched. One, which Plaintiffs advocate upon the Court, holds that the FSIA unequivocally shifted from the State Department to the courts responsibility for determining all claims of foreign immunity, including those filed on behalf of heads-of-state. Plaintiffs contend that this theory is reflected in the approach the Ninth Circuit adopted in *Chuidian*.[86]

A second strand, pressed by the Government and articulated by the Eastern District of New York in *Aristide*,[87] holds that the FSIA does not apply to claims of immunity asserted by heads-of-state. As to heads-of-state immunity, this view maintains, pre-FSIA common law practice remains valid, constraining the courts to accept as conclusive the State Department's suggestions of immunity. For the reasons indicated below, this Court concludes, though not fully accepting some of *Aristide's* implications nor rejecting all aspects of *Chuidian*, that the analysis in *Aristide* better accords with this Court's reading of the FSIA's text, purposes and legislative history. The *Aristide* outcome is also more consistent with other cases precisely on point, as well as with prevailing practices of customary international law as reflected in United States jurisprudence.

#### a. *Chuidian*

Plaintiffs contend, relying heavily on *Chuidian* and the line of cases following it, that the FSIA applies so as to authorize the courts to adjudicate all claims of immunity not only by foreign governments, but by individual government officials, including heads-of-state, and that courts need not defer to State Department suggestions of immunity because the Act stripped the Executive Branch entirely of its former role in that process.

A full review of the facts in *Chuidian* is essential to an understanding of the actual

---

**85.** *See, e.g., Clinton v. Jones,* 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *but cf. Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (former president entitled to absolute immunity from liability predicated on official acts).

**86.** *See* 912 F.2d 1095.

**87.** *See* 844 F.Supp. 128.

scope of the Ninth Circuit's holding and to a full assessment of Plaintiffs' contention here. *Chuidian* was brought by a Philippine citizen who owned various business interests in California. As part of a settlement of litigation commenced during the rule of former President Ferdinand Marcos between Chuidian and a Philippine government export loan agency, the Philippine National Bank, also a state-owned entity, issued an irrevocable letter of credit to Chuidian on behalf of the export agency. Following the overthrow of Marcos, the new government appointed a Commission on Good Government charged with recovering the wealth Marcos had unlawfully accumulated and held abroad.[88]

Acting in accordance with this mandate, Raul Daza, a member of the Commission and a named defendant in the case, instructed the Bank not to honor Chuidian's letter of credit, purportedly because the settlement it secured was a fraudulent transaction whose purpose was to induce Chuidian not to reveal information about Marcos's personal interests in Chuidian's business enterprises. When the Bank refused to make payment on the letter of credit, Chuidian sued, naming Daza among the defendants. Among his claims, Chuidian asserted intentional interference in his contractual relations with the Bank.[89]

Though sued individually, Daza argued that he was entitled to sovereign immunity because he qualified as an "agency or instrumentality of a foreign state" as defined by FSIA § 1603(b). Chuidian countered that the Act was not meant to cover individuals sued for acts taken in their private capacities, or alternatively, that Daza and the conduct in question were otherwise encompassed by the FSIA's exceptions to sovereign immunity.[90] On this theory, because the Act provided the sole source of recognition of sovereign immunity, and Daza did not satisfy the definition of a "foreign state," his claim to immunity could not be granted.

The Government, in a "Statement of Interest"[91] issued by the Department of State on Daza's behalf, agreed with Chuidian's argument. It maintained that, in fact, as a private person, rather than a state-owned corporation or other entity, Daza was not covered by the Act, but that, as a representative of the state engaged in official business in the underlying transaction, he was nonetheless eligible to be granted immunity at the State Department's behest under pre-FSIA common law doctrine.[92] According to the Government's view, the Act replaced the common law sovereign immunity rules only in the context of claims brought against a foreign state or its instrumentalities; otherwise, as to individual government officials whose acts are not specifically covered by the Act, the common law sovereign immunity doctrine, as defined in the Restatement (Second) of Foreign Relations Law § 65[93] and contemplating the binding effect of the

**88.** *See Chuidian,* 912 F.2d at 1097.

**89.** *See id.*

**90.** *See Chuidian,* 912 F.2d at 1099.

**91.** The Government distinguishes between an assertion in a suggestion of immunity, which it contends confers absolute common law immunity that must be given conclusive effect by the courts, and a "statement of interest", which it deems akin to an amicus brief in which it argues that a particular non-binding analysis should be considered by the court in assessing an official's claim for immunity. *See* Government's Memorandum of Law in Reply to Plaintiffs' Answering Brief Concerning Defendants' Immunity, dated June 1, 2001, (hereinafter "Gov't Reply"), at 16.

**92.** *See id.*

**93.** *See supra* note 28 for the text of Restatement § 65.

State Department's declarations of sovereign immunity, remained valid.[94]

The Ninth Circuit acknowledged that the Act was ambiguous in regards to its application to individuals.[95] In the court's reading, the legislative history suggested that Congress was concerned primarily with governmental organizations acting on behalf of foreign states and did not explicitly contemplate individuals sued in that capacity.[96] In fact, one district court in the Ninth Circuit already had held precisely as much.[97] Nonetheless, the Circuit Court rejected the positions advanced by Chuidian and the Government. It noted that while the Act did not expressly include individuals within the definition of "foreign state", it also did not explicitly exclude them. Absent clear indication that the Act precluded immunity claims by natural persons, the court concluded that, as a codification of prevailing common law principles that extended immunity to certain individual foreign officials, the FSIA did cover Daza.[98]

In rejecting the Government's contention that the FSIA effectively bifurcated the sovereign immunity process—the same argument the Government urges before this Court—the *Chuidian* court observed

that "the principal distinction between pre–1976 common law practice and post–1976 statutory practice is the role of the State Department"[99] and that the Government's interpretation was inconsistent with Congress' manifest intent to remove the State Department's discretionary role in the process. Finding that the Act was meant to be comprehensive, the court concluded that the statute could not "reasonably be interpreted to leave intact the pre–1976 common law with respect to foreign officials", a proposition that would require courts to revert to the practice of giving conclusive weight to the State Department's determinations of whether or not a foreign government official's activities fall within the traditional exceptions to sovereign immunity.[100]

Addressing Chuidian's alternative theory—that in committing the alleged wrongs at issue Daza acted out of personal malice rather than in his official capacity—the Ninth Circuit made an observation, referred to by the parties here, that bears on the arguments in this case. The Court declared that "plainly Daza would not be entitled to sovereign immunity for acts not committed in his official capacity."[101] Nonetheless, the court concluded that, regardless of his motive, when Daza stopped

94. *See Chuidian,* 912 F.2d at 1101.

95. *See id.*

96. *See id.*

97. *See Republic of Philippines v. Marcos,* 665 F.Supp. 793, 797 (N.D.Cal.1987) (noting that the terms used in § 1603(b)—"agency" "instrumentality", "entity", and "organ"—clearly indicated the Act's intent to exclude natural persons).

98. *See Chuidian,* 912 F.2d at 1101. For this proposition, the Ninth Circuit found support in other cases it cited. *See Kline v. Kaneko,* 685 F.Supp. 386, 389 (S.D.N.Y.1988) ("The FSIA does apply to individual defendants when they are sued in their official capacity."); *American Bonded Warehouse Corp. v.*

*Compagnie Nationale Air France,* 653 F.Supp. 861, 863 (N.D.Ill.1987); *Rios v. Marshall,* 530 F.Supp. 351, 371 (S.D.N.Y.1981).

99. *Chuidian,* 912 F.2d at 1102.

100. *Id.* at 1102. The court noted that the *Restatement (Third) of Foreign Relations Law* §§ 451, *et seq.* (1986), which superseded the Second Restatement's scope of sovereign immunity the Government relied upon, entirely deleted the discussion of common law sovereign immunity and substituted a provision analyzing the relevant issues solely on the basis of the Act. *See id.* at 1103.

101. *See id.* at 1106.

the Bank's letter of credit payment to Chuidian, he was still purporting to act as a government official and exercising authority deriving entirely from his office as a member of the Presidential Commission.[102]

The *Chuidian* court's conclusion that the FSIA covers natural persons, but that sovereign immunity ceases when an individual state officer acts beyond the scope of his governmental authority, has been favorably cited or followed in other cases.[103] The Ninth Circuit itself, in two related actions arising out of alleged acts of torture, executions and other human rights abuses allegedly committed by former Philippine President Ferdinand Marcos and his government ministers, ruled that the FSIA could not serve to provide sovereign immunity for such conduct when it is taken beyond the authority of any public mandate and thus could not have constituted acts of an agent or instrumentality of a foreign state within the meaning of the FSIA.[104] In a similar vein, in *Cabiri v. Assasie–Gyimah*,[105] a court in this District held that alleged acts of torture committed by a foreign state's Deputy Chief of National Security fell outside his governmental authority, and the protections of the FSIA therefore did not extend to immunize the individual's private conduct.

### b. *Aristide*

Against the foregoing string of authority, the Government here continues to press the sovereign immunity theory *Chuidian* effectively rejected. The Government dismisses *Chuidian* and its line of precedents as inapposite and distinguishable in two critical respects: none of these cases involved a sitting head-of-state or foreign minister, and in none of them did the State Department file a suggestion of immunity.[106] Thus, the Government ar-

102. *See id.*

103. *See Byrd v. Corporacion Forestal y Industrial de Olancho S.A.*, 182 F.3d 380, 389 (5th Cir.1999) (holding that two individual officers of a state governmental corporation doing business with parties in the United States qualified as state entities and that the FSIA accorded immunity for their official acts, despite accusations that their conduct was actuated by retaliatory motives); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C.Cir.1997) (the son of a Crown Prince not entitled to FSIA immunity in connection with allegedly fraudulent agreement in furtherance of personal and private interests); *El–Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C.Cir.1996) (finding no evidence that actions by the Deputy Governor of the foreign state's central bank were private or personal, but were taken only in his official capacity on behalf of the bank).

104. *See Hilao v. Marcos (In re Estate of Ferdinand Marcos, Human Rights Litig.)*, 25 F.3d 1467 (9th Cir.1994); *Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Litig.)*, 978 F.2d 493 (9th Cir.1992), *cert. denied*, 508 U.S. 972, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993).

105. 921 F.Supp. 1189, 1198 (S.D.N.Y.1996); *see also Xuncax v. Gramajo*, 886 F.Supp. 162, 175–76 (D.Mass.1995); *cf. Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir.1995) (noting that the Act of State doctrine does not apply to acts of a governmental official committed in violation of the nation's basic laws and unratified by its government).

106. *See supra* notes 113–128 and accompanying text. The Government points out that in *Chuidian* what it filed was not a "Suggestion of Immunity" on behalf of the official, but what it characterized as a "Statement of Interest" in the case. *See* Gov't Reply, at 16; *see also Kadic*, 70 F.3d at 250 (where the State Department submitted a "Statement of Interest" disclaiming concern over the invocation of the political question doctrine to prevent adjudication of the underlying actions); *Lasidi*, (as reported by David A. Kaplan, *Reprieve for a Sheik*, Nat'l L.J., Oct. 10, 1983 at 2) (State Department filed a "Suggestion of Interest" indicating that it would be appropriate for the court to permit limited discovery in a suit concerning commercial interests involving the United Arab Emirates' head-of-state).

gues that, contrary to *Chuidian's* broad language and reasoning, courts uniformly have dismissed actions against heads-of-state where the Executive Branch did interpose a suggestion of immunity.

The Government relies upon *Aristide* [107] as its leading authority. There, plaintiff was the wife of Dr. Roger Lafontant, a political opponent who allegedly attempted a coup d'etat to prevent Haiti's then recently elected President Jean–Bertrand Aristide from assuming office. Aristide, according to plaintiff, ordered a member of Haiti's armed forces to execute Dr. Lafontant while in prison, an act plaintiff contended was a crime and a tort not officially sanctioned by or in furtherance of Aristide's official duties. Plaintiff brought suit during Aristide's exile in the United States. In that action, the Government, which had recognized Aristide as Haiti's lawfully elected head-of-state despite his overthrow, filed a suggestion of immunity asserting that " 'permitting this action to proceed against President Aristide would be incompatible with the United States' foreign policy interests.' " [108]

The court applied common law immunity principles to hold that, absent waiver by statute or by the relevant foreign government, Aristide, as Haiti's head-of-state recognized by the United States, was absolutely immune from the exercise of jurisdiction by United States courts. After examining the FSIA's legislative history, Judge Weinstein concluded that the statute was inapplicable to a recognized sitting head-of-state because the Act had not "modified the long standing rule of international and common law" relating to

head-of-state immunity.[109] Instead, the court read the intent of the Act more narrowly to contemplate the specified exemptions from sovereign immunity to apply to state-owned entities engaged in commercial activities. The Court noted that "the FSIA took these cases out of the political arena of the State Department, while leaving traditional head-of-state and diplomatic immunities untouched." [110]

In sharp contrast with the broad language and implications of *Chuidian,* Judge Weinstein declared that "the State Department needs to retain decisive control of grants of head-of-state immunity by preserving the pre-FSIA 'absolute' theory of immunity" and concluded that "the pre–1976 suggestion of immunity procedure survives the FSIA with respect to heads-of-state." [111] Accordingly, because Aristide enjoyed absolute head-of-state immunity, it was not necessary for the court to consider whether an act of his allegedly ordering a killing would be regarded as official or private.[112]

The central principle of *Aristide*—that the enactment of the FSIA did not alter the role or binding effect of the State Department's suggestions of immunity for foreign heads-of-state—in fact is consistently reflected in other post-FSIA cases where the Government filed suggestions of immunity. Especially on point in this regard is *Domingo v. Republic of the Philippines.*[113] There, plaintiffs alleged that the defendants, who included President Ferdinand Marcos and his wife Imelda, had planned, executed and covered up, during Marcos's rule, the murder of two senior

**107.** *See* 844 F.Supp. 128.

**108.** *Id.* at 131.

**109.** *Id.* at 135.

**110.** *Id.* at 137.

**111.** *Id.*

**112.** *Id.* at 139.

**113.** 694 F.Supp. 782 (W.D.Wash.1988).

Philippine political leaders who had opposed the Marcos regime.

Plaintiffs commenced their suit in 1981, while Marcos was still in power. In 1982, the court, in response to a suggestion of immunity filed by the State Department, ruled that the Marcoses were entitled to dismissal of the claims against them. At that time the court had found that the legislative history of the FSIA demonstrated "no evidence ... that Congress intended to eliminate the Suggestion of Immunity procedure as a means of securing the dismissal of an action against a foreign head of state" [114]. On this basis, the court concluded that it was bound to accede to the State Department's intercession on behalf of the Marcoses.[115]

In 1987, however, after the Marcoses fell from grace and left office for exile in the United States, plaintiffs moved to reinstate the earlier dismissed claims against them in the same action, which had proceeded against the remaining defendants. On this occasion, the court granted the motion, noting that neither the United States nor the government of the Philippines had interceded on the Marcoses' behalf to assert immunity and that whatever significance the State Department's suggestion possessed when it was filed in 1982 had expired by reason of the changed circumstances.[116]

Also instructive is *First Am. Corp. v. Al–Nahyan.*[117] Plaintiffs in that case asserted claims naming various government officials and entities of the United Arab Emirates ("U.A.E."), including H.H.

Sheikh Zayed ("Zayed"), the U.A.E.'s sitting head-of-state. The complaint alleged various fraudulent schemes and investments by defendants in connection with attempts to acquire certain banking interests in the United States. The Government filed a suggestion of immunity on behalf of Zayed. The court, rejecting arguments that the FSIA governed Zayed's assertion of immunity, ruled that claims against Zayed were barred because he was entitled to immunity from the court's jurisdiction under the head-of-state doctrine.[118] On this point, the court declared:

> the enactment of the FSIA was not intended to affect the power of the State Department ... to assert immunity for heads of state or for diplomatic and consular personnel .... The United States has filed a Suggestion of Immunity on behalf of H.H. Sheikh Zayed, and the courts of the United States are bound to accept such head of state determinations as conclusive.[119]

As regards the issue of the FSIA's application to individuals, the court observed that the Act's focus " 'is towards corporate and government entities—legal yet nonnatural "persons." Nowhere does the FSIA discuss the liability or role of natural persons, whether governmental officials or private citizens.' "[120] Significantly, the court held that certain defendants who were members of the ruling family of a political subdivision of the UAE, which thus was not a recognized independent state, were not entitled to head-of-state

---

114. *Estate of Silme G. Domingo v. Marcos,* No. C82–1055V, slip. op. at 4 (W.D.Wash. July 14, 1983).

115. *See Domingo,* 694 F.Supp. at 786.

116. *See id.*

117. 948 F.Supp. 1107 (D.D.C.1996).

118. *See id.* at 1119.

119. *Id.* (citing *Ex Parte Peru,* 318 U.S. at 588–89 and *Aristide,* 844 F.Supp. at 137).

120. *Id.* at 1120 (quoting *Herbage v. Meese,* 747 F.Supp. 60, 66 (D.D.C.1990), *aff'd,* 946 F.2d 1564 (D.C.Cir.1991)).

immunity because none was a sitting head-of-state and the State Department had not suggested immunity on their behalf.[121] Similar reasoning and results are recorded in other cases involving State Department suggestions of immunity invoking the emerging head-of-state doctrine.[122]

Equally germane is the courts' treatment of sovereign immunity in cases involving former or sitting heads-of-state where the State Department has decided not to intercede; where a waiver of immunity has been filed by the current foreign government; or where the United States does not recognize the legitimacy of the particular state or ruler.[123] In *Karadzic*,

for example, the district court declined to exercise subject matter jurisdiction over claims alleging human rights violations brought against the self-declared head of the Bosnian–Serb entity, neither the state or ruler of which the United States had recognized. In considering Karadzic's claim of head-of-state immunity, the district court stated that "[w]ere the Executive Branch to declare defendant a head-of-state, this Court would be stripped of jurisdiction." [124]

On appeal, the Second Circuit, reversing the finding on subject matter jurisdiction, implicitly endorsed the district court's stat-

---

121. *See id.* at 1121.

122. *See, e.g., Alicog v. Kingdom of Saudi Arabia,* 860 F.Supp. 379, 382 (S.D.Tex.1994) (dismissing a claim against King Fahd on the appearance by the United States to acknowledge that King Fahd was the recognized head of state of Saudi Arabia, which representation the court accepted as conclusive); *Saltany v. Reagan,* 702 F.Supp. 319, 320 (D.D.C.1988) (claim naming British Prime Minister Margaret Thatcher in an action for damages arising out of the United States bombing raids in Lybia dismissed on the basis of the Government's suggestion of immunity for a sitting head of government), *aff'd in part, rev'd in part,* 886 F.2d 438 (D.C.Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990); *Gerritsen v. de la Madrid,* No. CV–85–5020–PAR, slip. op. at 7–9 (C.D.Cal. Feb. 5, 1986) (in an action naming the President of Mexico and other Mexican officials in their individual and official capacities and alleging unlawful use of threat and force to prevent plaintiff from distributing leaflets in a public park in Mexico, the court accepted the State Department's suggestion of immunity on behalf of the Mexican President, noting that the FSIA "does not refer to individual representatives of foreign governments" and that its enactment "was not intended to affect the power of the State Department to assert immunity for diplomatic and consular personnel," which authority the court found extended to immunity for a head-of-state); *Kilroy v. Windsor,* No. C 78–291, slip. op. (N.D.Ohio Dec. 7, 1978); *see also*

*Kline,* 685 F.Supp. at 392 (in an action alleging kidnapping and wrongful expulsion from Mexico and naming as a defendant the wife of the President of Mexico, the court observed that "it appears that defendant Cordero De La Madrid may be entitled to a dismissal under the Head of State doctrine", though the court did not rule on the question because it held that it lacked jurisdiction in other respects and remanded the case to the state court). On remand the state court deferred to the State Department's suggestion of immunity and dismissed as to Mrs. De La Madrid. *See Kline v. Kaneko* 141 Misc.2d 787, 535 N.Y.S.2d 303 (Sup.Ct.N.Y.Co.1988), *aff'd,* 154 A.D.2d 959, 546 N.Y.S.2d 506 (N.Y.App. Div. 1st Dep't 1989); *see also Guardian F. v. Archdiocese of San Antonio,* Case No. 93–CI–11345 (Tex.Dist.Ct.1994) (suit against Pope John Paul II dismissed on Government's suggestion of immunity); *Kim v. Kim Yong Shik,* Civ. No. 12565 (Cir. Ct. 1st Cir. Hawaii 1963), *reported in* 58 Am. J. Int'l L. 186 (1964) (in pre-FSIA case, the court extended immunity to a foreign minister, deferring to a State Department suggestion of immunity).

123. *See, e.g., Doe v. Karadzic,* 866 F.Supp. 734, 737–38 (S.D.N.Y.1994), *rev'd on other grounds, Kadic v. Karadzic,* 70 F.3d 232 (2d Cir.1995); *see also In re Doe,* 860 F.2d at 43; *In re Grand Jury Proceedings,* 817 F.2d at 1110; *Noriega,* 746 F.Supp. at 1520; *Domingo,* 694 F.Supp. at 786; *Hilao v. Estate of Marcos,* 25 F.3d 1467, 1472 (9th Cir.1994).

124. 866 F.Supp. at 738.

ed assumption and the reasoning in *Aristide* by positing that recognition of Karadzic as head-of-state by the Executive Branch in the future may confer immunity over the actions at issue.[125] For the purposes of the case at bar, what is especially relevant and instructive in these circumstances is the courts' implied assumption that, but for the immunity waiver or absence of the State Department's intercession, a head-of-state immunity might still present a viable defense.

The Second Circuit intimated as much in *In re Doe*,[126] an action against former President Marcos of the Philippines and his wife alleging fraud and embezzlement of public funds. The Marcoses there asserted head-of-state immunity to resist subpoenas served on them. The Philippines government of Marcos's successor presented a diplomatic note to the State Department purporting to waive any residual immunity the Marcoses may have possessed under international and United States law.

On appeal from the district court's ruling accepting the waiver of immunity and holding the Marcoses in contempt for not complying with the subpoenas, the Second Circuit affirmed. The Court of Appeals observed that "because the FSIA makes no mention of heads-of-state their legal status remained uncertain."[127] It then added: "[w]hen lacking guidance from the executive branch, as here, a court is left to decide for itself whether a head-of-state is or is not entitled to immunity."[128]

### c. Beyond Chuidian and Aristide

Taken as a whole, the import of the body of case law discussed above is that, whatever may be said in general concerning the effect and application of the FSIA to lower ranking individual foreign officials, whether sued in their governmental or private capacities, "the exact contours of head-of-state immunity ... are still unsettled."[129]

Despite that part of the FSIA's legislative history prompted by the State Department's practices of filing suggestions of immunity pursuant to the Tate Letter and Congress' expressed intent to alter that process, the courts uniformly have continued to recognize an exception from application of the FSIA in cases dealing with actions brought against sitting heads-of-state on whose behalf the United States intercedes to confer immunity. This practice is regarded as a matter either not specifically addressed or explicitly precluded by the FSIA.

The emerging consensus points to a rule of law encompassing uniquely the scope of immunity of foreign heads-of-state from the jurisdiction of United States courts. It holds that in enacting the FSIA, Congress did not envision disturbing the traditional practice of the State Department, through filing its suggestions of immunity, conferring upon recognized heads-of-state absolute protection from the exercise of jurisdiction by courts in this country.[130]

**125.** *See Kadic*, 70 F.3d at 248 (citing *In re Doe*, 860 F.2d at 45, for the proposition that the scope of head-of-state immunity remains unsettled).

**126.** 860 F.2d at 45; *see also In re Grand Jury Proceedings*, 817 F.2d at 1111 (holding that head-of-state immunity is waivable at the behest of the sending state and accepting the Philippines government's waiver of whatever immunity Ferdinand and Imelda Marcos may have enjoyed).

**127.** 860 F.2d at 45.

**128.** *Id.*

**129.** *In re Grand Jury Proceedings*, 817 F.2d at 1110.

**130.** *See supra* note 122 and cases cited therein; *see also United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir.1997) ("Because the FSIA addresses neither head-of-state immuni-

Nonetheless, despite developing agreement on some aspects of the FSIA's effects on head-of-state immunity, several issues have surfaced which have yet to be conclusively resolved. Among the open questions are: (1) Who is entitled to assert head-of-state immunity? While the courts uniformly have accepted the claim as to heads-of-state and heads-of-government recognized by the United States, questions remain as to how far down the hierarchical chain the protection could legitimately extend.[131] (2) What are the extent and circumstances under which head-of-state immunity may be waivable? [132] (3) To what degree are acts of individuals rather than governmental offices covered? [133] (4) Is there a distinction between private and governmental acts to which immunity may extend? [134] (5) Is there a difference in the degree of immunity conferred as between sitting and former heads-of-state? [135] (6) What is the exact weight to be accorded by the courts to the State Department's suggestions of immunity, and indeed whether, as the *Chuidian* court questioned, this role survived the FSIA at all? [136]

In light of these remaining uncertainties, this Court cannot conclude that resolution of the issues Plaintiffs present here is as clearly indicated as they contend. Absent more definitive guidance, this Court is persuaded that the more prudent course is one which does not presume that Congress squarely confronted these questions in drafting the FSIA and unequivocally had them all in mind at the time it adopted the statute, thereby indisputably resolving in the text of the Act the issues here in dispute. As already discussed,

ty, nor foreign sovereign immunity in the criminal context, head-of-state immunity could attach in cases . . . only pursuant to the principles and procedures outlined in *The Schooner Exchange*, and its progeny. As a result, this court must look to the Executive Branch for direction on the propriety of Noriega's immunity claim."), *cert. denied*, 523 U.S. 1060, 118 S.Ct. 1389, 140 L.Ed.2d 648 (1998).

**131.** *See Republic of Philippines v. Marcos*, 665 F.Supp. 793, 797–98 (N.D.Cal.1987) (rejecting a suggestion of immunity filed by the State Department on behalf of the Philippines Solicitor General, the court noted that the official was neither a sovereign or a foreign minister, "the two traditional bases for a recognition or grant of head-of-state immunity," and declared "[t]he government in this instance seeks to expand the head-of-state doctrine to encompass all government officials of a foreign state to whom the State Department chooses to extend immunity. There is no precedent for such a radical departure from past custom . . . ."); *see also El–Hadad v. Embassy of the United Arab Emirates*, 69 F.Supp.2d 69, 82 n. 10 (D.D.C.1999) (while dismissing on other grounds and not dispositively addressing defendants' claim of head-of-state immunity as embassy officials representing the President of the U.A.E., the court

noted that the head-of-state doctrine "is limited only to the sitting official head-of-state . . . . The Court declines to expand the head-of-state immunity to cover all agents of the head-of-state.") (citations omitted), *aff'd in part, rev'd in part*, 216 F.3d 29 (D.C.Cir.2000).

**132.** *See In re Doe*, 860 F.2d at 45; *In re Grand Jury Proceedings*, 817 F.2d at 1110; *Aristide*, 844 F.Supp. at 134; *Paul v. Avril* 812 F.Supp. 207 (S.D.Fla.1993); *see also Hilao*, 25 F.3d at 1472 (declining to reach plaintiffs' contention that communications from the then current Philippines government purporting to waive Marcos's immunity, as well as Marcos's argument that there is no authority allowing one government official to waive the immunity of another official); *Chuidian*, 912 F.2d at 1103–05 (waiver by one governmental entity does not extend to another entity).

**133.** *See Republic of Philippines*, 665 F.Supp. at 798–99; *Aristide*, 844 F.Supp. at 139.

**134.** *See In re Doe*, 860 F.2d at 44–45; *Hilao*, 25 F.3d at 1470–71.

**135.** *See In re Doe*, 860 F.2d at 45; *In re Grand Jury Proceedings*, 817 F.2d at 1110.

**136.** *See supra* notes 97–99 and accompanying text.

nothing in the legislative history indicates that Congress even implicitly considered these matters. Simply put, the head-of-state immunity issues described above were not yet "in the air" as part of the underlying concerns that prompted the FSIA nor in the debate and deliberations that accompanied the enactment.

Rather, the dominant thrust of the FSIA, as Congress declared in its legislative findings, and as manifest on its face, relates to "the claims of *foreign states* to immunity" from jurisdiction of United States Courts.[137] Congress' expression of statutory purpose, after noting that "[u]nder international law, *states* are not immune from the jurisdiction of foreign courts insofar as their *commercial activities* are concerned," further asserted that "[c]laims of foreign *states* to immunity should henceforth be decided by the courts of the United States ... in conformity with the principles set forth in this chapter."[138]

The statute, as the Second Circuit has recognized, "makes no mention of heads-of-state."[139] Instead, it evinces a central concern with the adjudication of claims of sovereign immunity asserted in legal disputes arising from the commercial activities of states, their governmental agencies or public trading companies. The ordinary controversies that arose out of those claims were peculiarly susceptible to resolution by courts in accordance with familiar rules of law that offered the parties a greater measure of coherence, predictability and objectivity in an impartial forum, as well as a judicial process free from political and diplomatic pressures. This was an adjudicative process known to foreign states, consistent with international practices that had become prevalent. At the time the FSIA was enacted, most other nations had already adopted the restrictive theory of immunity to address precisely these considerations, as Congress itself acknowledged in expressing its intent to "conform to the practice in virtually every other country."[140]

While the "practice in virtually every other country" may have been uniform with regard to dealing with claims of immunity by states and their governmental entities in commercial disputes, it would be a dubious proposition to declare that uniform rules and practices that could be considered customary international law then existed with regard to sovereign immunity assertions made on behalf of heads-of-state. The record appears quite to the contrary.

Not only the uncertainty surrounding the basic head-of-state immunity issues— many of them still unsettled today, let alone in 1976—but the distinct diplomatic considerations and political consequences associated with the two forms of immunity also suggest the absence of prevailing standards that could have been the subject of considered and intended legislative codification in the Act.

■ Several elements establish the differences between sovereign immunity for states and their governmental entities as opposed to heads-of-state, and support a finding that, until otherwise definitively settled by Congress, the Executive Branch's role in determinations of head-of-state immunity was not affected by the passage of the FSIA. By reason of the traditional identity of the sovereign as both the state and its ruler, a residual political embodiment that still holds

137. 28 U.S.C. § 1602 (emphasis added).

138. *Id.* (emphasis added).

139. *In re Doe,* 860 F.2d at 45.

140. H.R. Report, at 7.

sway in some countries, individual and human dimensions enter into the mix in matters of sovereign immunity implicating recognized heads-of-state. Affronting the person and dignity of the leader of a sovereign nation, through an exercise of another state's territorial jurisdiction over the ruler, has a greater potential for fraying sensibilities than may be associated with subjecting foreign state agencies or their officials to the power of the courts in commercial disputes. In the latter cases, states can more readily agree to the wisdom and applicable rules of engagement.

Moreover, some widely recognized judicial standards exist to guide adjudication of disputes involving state companies and their ordinary trading ventures. No such coherent and widely accepted rules exist as yet as regard heads-of-state. Thus, far greater likelihood exists for stirring embarrassment and offense to national pride and provoking acts of retaliation in connection with an exercise of jurisdiction extended individually to a nation's ruler by denial of sovereign immunity than by such action asserted against state commercial entities or even lesser foreign government officials. The potential for harm to diplomatic relations between the affected sovereign states is especially strong in cases, such as the one now before this Court, that essentially entail branding a foreign ruler with the ignominy of answering personal accusations of heinous crimes.

The significant distinction between the head-of-state and other governmental officials that justifies different sovereign immunity treatment was recognized and underscored in *The Schooner Exchange.*

There Chief Justice Marshall in fact identified the "exemption of the person of the sovereign from arrest or detention within a foreign territory" [141] as an exception to the exercise of territorial jurisdiction in a category separate even from that pertaining to the immunity accorded to diplomatic ministers.[142] The Chief Justice acknowledged the unique personal sensibilities that attach to immunity for heads-of-state:

A foreign sovereign is not understood as intending to subject himself to a jurisdiction incompatible with his dignity, and the dignity of his nation, and it is to avoid this subjection that the license has been obtained. The character to whom it is given, and the object for which it is granted, equally require that it should be construed to impart full security to the person who has obtained it.[143]

Second, the reasons that prompted Chief Justice Marshall to classify immunity for the sovereign ruler in a category separate from that related to diplomatic envoys has another dimension. Unlike the sovereign nation itself, the head-of-state is not a static abstraction. The ruler travels. And when heads-of-state journey abroad on official business, they often engage in diplomatic activities and attend political and ceremonial functions, always uniquely attended by the emblems and trappings of office symbolizing the representation of their governments and sovereign states.

These foreign duties demand policies and practices—as an aspect of comity also fostering reciprocity—designed to safeguard that heads-of-state abroad be accorded the mutual respect and personal dignity to which their status entitles them.[144] That scope of protection would

141. 11 U.S. (7 Cranch) at 137.

142. *See id.* at 138.

143. *Id.* at 137–38.

144. *See Satow's Guide,* at 9–10 ("It has been established for several centuries in customary international law that a sovereign, or head of state, who comes within the territory of another sovereign is entitled to wide privileges

extend to heads-of-state a level of immunity from territorial jurisdiction at minimum commensurate with that accorded by treaties and widely accepted customary international law to diplomatic and consular officials,[145] although, for the reasons stated above, an even greater degree of protection of heads-of-state would be warranted. As one court observed, it would be anomalous for states to confer upon their foreign envoys abroad diplomatic privileges and immunities extending farther than the immunity they recognize for heads-of-state.[146]

Third, while it may be only a modest extension under the FSIA definition of a foreign state to consider an individual official as an "agency" or "instrumentality", the fit is more awkwardly stretched as applied to head-of-state.[147] By tradition, an act of the nation's leader has more claim to be identified and associated as that of the "foreign state" itself, which the FSIA exempts from the exercise of the courts' jurisdiction.

Fourth, because the state and its ruler customarily have been so closely identified and intertwined, as regards a head-of-state it is far more difficult to draw the line distinguishing between conduct that is official and unofficial. The range of public activities directly involving heads-of-state is more encompassing and the demarcations of actions associated with them are more blurred than is the case as regards lesser officials and state agencies, the governmental functions of which are more discrete and better definable.

Fifth, issues as to who qualifies to be considered a head-of-state, under what circumstances, and how far and for how long the scope of immunity stretches, require more nuanced political and diplomatic judgments than those pertaining to the mandate of state entities or lesser officials. As *Noriega* and *Aristide* demonstrate, head-of-state immunity is an attribute of state sovereignty, not an individual right.[148] The grant of immunity is also a matter of grace and comity entirely within the discretion of the Executive Branch.[149] Unlike the case of lower-ranking officials, head-of-state status requires a formal act of recognition by the Executive Branch, and only officials so recognized can claim entitlement to the corresponding privileges and immunities.[150]

---

and to ceremonial honours appropriate to his position and dignity, and to full immunity from the criminal, civil and administrative jurisdiction of the state which he is visiting .... A head of state, whether a hereditary ruler or an elected president, does not enter the territory of another state in his official capacity without the clearest assurances being expressed or implied that full immunity and full ceremonial honours will be accorded.").

145. *See id.* (noting that "[t]he personal status of a head of state of a foreign state therefore continues to be regulated by long-established rules of customary international law" which include immunity from criminal and civil jurisdiction; inviolability of his residence, person and movable property; exemption from taxes and searches of baggage and goods brought along; and similar protection for his spouse, family and possibly members of his official entourage).

146. *See In re Grand Jury Proceedings*, 817 F.2d at 1111 (referring to the state's power to revoke immunity).

147. *See Aristide*, 844 F.Supp. at 136 (noting that "[n]o case has ... construed 'agency or instrumentality' to include a head-of-state").

148. *See Aristide*, 844 F.Supp. at 132–33; *Noriega*, 746 F.Supp. at 1519; *see also In re Grand Jury Proceedings*, 817 F.2d at 1111.

149. *See Verlinden*, 461 U.S. at 486, 103 S.Ct. 1962; *The Schooner Exchange*, 11 U.S. (7 Cranch) at 136.

150. *See Noriega*, 746 F.Supp. at 1520 n. 14 ("[S]ince ... head of state immunity is a privilege bestowed within the Executive's dis-

Immunity judgments also tend to present especially delicate complexities by virtue of the need to differentiate in some circumstances between the state, the head-of-state and the head-of-government. Thus, the Government may choose to recognize a particular state, but not its declared head-of-state. Or it may recognize a state and head-of-state but not the nation's head-of-government. In other words, the act of political recognition of the head-of-state requires its own exercise of executive power, separate and apart from diplomatic recognition of the state, in accordance with the Executive Branch's assessment of the nation's various foreign relations interests.

Decisions, for instance, about which leader the country recognizes, or whether the head-of-state's immunity should be extended to a spouse or to a special envoy on a particular high-level mission on behalf of the head-of-state, if second guessed by the courts, could inevitably lead to foreign relations complications and invite reciprocal treatment. Those determinations are generally subject to their own intrinsically political and diplomatic considerations that could not readily lend themselves to coherent rules devised by the courts. Finally, after a head-of-state leaves office his former public status and corresponding privileges and immunities may require broader recognition and more complex waiver rules than ordinarily may be necessary to attach to lower ranking state officials.

In sum, the several considerations attest that Congress could not have encompassed resolution of the open questions described above in the FSIA. While ordinarily Congress should be ascribed its due measure of prescience, the legislative record of the FSIA is too sparse to support a fair inference that Congress' intent reached as far as Plaintiffs here urge to address concerns that were largely unknown at the time. Matters of such moment and magnitude, as regards sensitive issues touching on foreign relations—no less so than as to constitutional questions—should not be grounded on what at best may be described as adumbrations of Congressional design divined from legislative silences, or emanating from the interstices or penumbras of the law. As the Second Circuit advised in *In re Doe,*

> in the constitutional framework, the judicial branch is not the most appropriate one to define the scope of immunity for heads-of-state .... If heads-of-state or former heads-of-state are to be immune for property allegedly taken in violation of international law, Congress should enact—or amend existing—legislation to make that clear.[151]

d. *Plaintiffs' Authorities Distinguished*

The cases and authorities Plaintiffs rely upon do not support a contrary reading of the FSIA's intent, at least as it pertains to the Act's application to immunity for heads-of-state. Plaintiffs' argument rests heavily on the line of cases, discussed above, which have held that the FSIA's definition of "foreign state" extends to individuals deemed to constitute state "agencies", "legal persons", "entities" or "instrumentalities." [152] While there is significant opinion supporting that interpretation, some courts addressing the exact question have squarely ruled otherwise,[153] so that

cretion, the government is not bound to a position it has taken on another foreign official in an entirely different context."); *see also Aristide,* 844 F.Supp. at 132–33.

**151.** 860 F.2d at 45.

**152.** *See supra* note 98 and accompanying text.

**153.** *See First Am. Corp.,* 948 F.Supp. at 1120; *Herbage,* 747 F.Supp. at 66; *Republic of the Philippines,* 665 F.Supp. at 797.

the proposition is by no means entirely settled.

Second, all of these cases have turned essentially on one central fact: the actions the foreign officials were carrying out which gave rise to the claims brought against them in court were found to fall within the scope of their official duties. To this extent the outcome in the cases is unremarkable and by no means surprising. That result is consistent, as the *Chuidian* court observed, with the general principle established in our domestic law that "a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly." [154] The doctrine recognizes that actions naming government officers as defendants for suits in their capacities as public agents are only alternative means of asserting a claim against the state itself and that typically plaintiffs in these cases contemplate that ultimately any recovery would come from the state treasury. On this basis, the rule distinguishes official-capacity suits from strictly personal claims. [155]

Starting from its predicated lack of practical difference between these two situations, the Ninth Circuit rejected an inference that, in passing the FSIA, Congress "intended to allow unrestricted suits against individual foreign officials acting in their official capacities." [156] In this regard, the court expressed concern that a contrary result would encourage litigants to evade the effects of the FSIA through artifice, pleading claims against individual officials rather than directly against the foreign state itself, thereby effecting "a blanket abrogation of foreign sovereign immunity by allowing litigants to accomplish indirectly what the Act barred them from doing directly." [157]

Based on its stated premise, the court concluded that actions brought against government agents naming them individually, as well as the officials' assertions of sovereign immunity, must be assessed within the framework of the FSIA and the exemptions the Act delineates to the doctrine of immunity for states. It thus reflected the basis argued by the Government of the pre-FSIA common law deference under which the courts gave conclusive effect to assertions of immunity by the State Department on behalf of foreign officials.

On this point, the Ninth Circuit, again referring to the practical equivalence between suits against foreign states and suits against a state's officials acting within the scope of governmental functions, was troubled by the prospect of promoting "a peculiar variant of forum shopping" [158] in which some litigants would choose to sue the foreign officials, while others would file directly against the foreign states, depending on their assessment of the State Department's likelihood of interceding and its potential influence in one instance rather than another.

Whatever the merits of these considerations, neither the *Chuidian* court's analysis, nor that of the other cases which have followed it, had occasion to consider the

---

**154.** *Chuidian*, 912 F.2d at 1101 (citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

**155.** *See Restatement (Second) of Foreign Relations Law* § 66(f) (recognizing that immunity extended to any state official or agent with respect to acts performed in an official capacity "if the effect of exercising jurisdiction would be to enforce a rule of law against the state").

**156.** *Chuidian,* 912 F.2d at 1102.

**157.** *Id.*

**158.** *Id.*

unique circumstances associated with an action brought directly against a sitting head-of-state or foreign minister of a government recognized by the United States, whether the acts challenged are official or unofficial. Nor did they squarely confront the threshold issue, central to the dispute at hand, of the effect of a suggestion of immunity filed by the Department of State relating to an exercise of a court's jurisdiction over a recognized sitting head-of-state. In none of the cases grounding Plaintiffs' arguments did the State Department intercede with such a suggestion.[159]

In fact, only one instance, *Republic of the Philippines*,[160] has been reported in which a State Department suggestion of immunity was filed and not honored by a court. There, the action entailed not a head-of-state, but the foreign country's Solicitor General. That official, while traveling on government business in the United States, was served with a subpoena for a deposition and a request for production of documents. Insofar as the court declared that the FSIA entirely abrogated the Executive Branch's role in filing suggestions of sovereign immunity on behalf of foreign sovereigns, the statement runs counter to the greater weight of opinion which has held otherwise.

Moreover, the court also relied for its holding upon a determination that the FSIA does not apply to individual government officials, a construction of the statute that the Ninth Circuit abrogated in *Chuidian*. Thus, the case could have been decided, following the *Chuidian* reasoning, on the ground that an exercise of jurisdiction over the Solicitor General, as a representative of the government acting in his official capacity, was tantamount to an action brought against the state itself and thus entitled to immunity under the FSIA because it did not fall within any of the Act's exemptions.

By the same token, cases such as *Cabiri*[161], which hold that foreign government officials sued in their individual capacity for unofficial acts do not enjoy FSIA immunity, shed no more light on the precise issues here because they entailed neither sitting heads-of-state nor consideration of a suggestion of immunity filed by the State Department. To be sure, a plausible argument may be constructed that, in light of the concerns pertaining to the State Department's suggestion of immunity practices that prompted the adoption of the FSIA, there must be some limit on the circumstances and on the individual foreign officials on whose behalf the State Department may interpose the protection of the emerging head-of-state doctrine. A gray zone may exist in which conceivably the bounds of FSIA immunity for foreign states and assertions of head-of-state immunity may intersect, overlap or even collide.

A not so far-fetched set of facts may be conceived under which the State Department, subjected to foreign government diplomatic and political pressures of the kind that propelled the enactment of FSIA, would, under the banner of its application of common law head-of-state sovereign immunity, intervene to assert immunity on behalf of an individual foreign official who clearly is not a sitting head-of-state, nor acting on a foreign mission as

---

**159.** *See supra* note 91 for a discussion of the Goverment's "statement of interest" expressed in *Chuidian*.

**160.** 665 F.Supp. at 797–98. While the Court rejected the claim of immunity under the head-of-state doctrine, it held that the official,

present in the United States on a government mission, was entitled to diplomatic immunity.

**161.** *See* 921 F.Supp. at 1197–98; *see also Hilao*, 25 F.3d at 1470.

special envoy or surrogate of the head-of-state, but is rather involved in his private or official capacity in a commercial dispute of the kind the FSIA explicitly contemplated to be excluded from claims of sovereign immunity. Such hypothetical circumstances are not inconceivable because, in fact, they are not far afield from some of the pertinent events that arose in *Chuidian* and *First Am. Corp.*[162]

Fundamentally, the dispute at issue in *Chuidian* centered on a commercial transaction involving a foreign state "agency or instrumentality", albeit represented by an individual acting in his official capacity—a fact that the State Department itself may have recognized when it characterized its intervention not as a suggestion of immunity but as a "statement of interest." Viewed in this light, the *Chuidian* outcome is unassailable and the Government's intervention there was somewhat flawed. Closer to home, the supposed situation may prevail in this case in relation to Plaintiffs' claims against the ZANU–PF, discussed further in Part III below.

Were the State Department to file a suggestion of immunity on behalf of foreign officials under these circumstances, arguably its action would prompt the kinds of concerns that impelled the FSIA and raise valid questions as to whether the assertion of immunity should be evaluated under the framework of the FSIA or of pre-FSIA doctrine as it applies to heads-of-state. The Second Circuit intimated as much in *In re Doe*, where it noted that "were we to reach the merits of the issue, we believe there is respectable authority for denying head-of-state immunity to a former head-of-state for private or criminal acts in violation of American Law." [163] For that reason, this Court believes that both *Chuidian* and *Aristide* may overstate their essential positions insofar as they purport to offer an overly categorical reading of the FSIA's effect on the State Department's role in the foreign immunity process and the weight the courts should accord the Department's declarations, at least as these pertain to recognized heads-of-state.

The matter now before this Court, however, as it relates to Mugabe and Mudenge, does not present the hypothetical overlapping zone posited above. Rather, it squarely implicates both an action brought individually and directly against a sitting foreign head-of-state and a foreign minister, and an invocation of the head-of-state doctrine through a formal Suggestion of Immunity filed on their behalf by the Department of State declaring that "permitting this action to proceed against the President and the Foreign Minister would be incompatible with the United States' foreign policy interests." [164]

◼ The Government's assertion of head-of-state immunity as to Mugabe extended to Mudenge, traveling as Foreign Minister and as a member of Mugabe's official entourage at the time he was served.[165] Accordingly, the Court concludes that, contrary to Plaintiffs' argument, the FSIA does not serve to abrogate the State Department's decisive role in the recognition of head-of-state immunity, nor

---

**162.** *See Chuidian,* 912 F.2d at 1097, 1099; *First Am. Corp.,* 948 F.Supp. at 1121; *see also Lasidi, supra* note 72.

**163.** 860 F.2d at 45 (citing *The Schooner Exchange,* 11 U.S. (7 Cranch) at 135 and *Republic of the Philippines v. Marcos,* 806 F.2d 344, 360 (2d Cir.1986)) (emphasis added).

**164.** Suggestion, at 2.

**165.** *See Satow's Guide,* at 10; *see also Kim,* 58 Am. J. Int'l L. at 186.

to negate the head-of-state immunity invoked here by the State Department on behalf of Mugabe and Mudenge.

■ Inasmuch as the Court's honoring of the Executive Branch's Suggestion of Immunity is fully dispositive of the matter as it pertains to the Court's lack of personal jurisdiction over Mugabe and Mudenge, it is unnecessary for the Court to consider the merits of the substantive basis of Plaintiffs' claims of subject matter jurisdiction under the ATCA and the TVPA. It suffices to say, as the *Aristide* court concluded, that the TVPA does not negate head-of-state immunity,[166] and there are no defensible grounds for a different outcome as it relates to an action invoking the ATCA.

## II. *DIPLOMATIC IMMUNITY*

■ The Suggestion asserts that in addition to head-of-state immunity, Mugabe and Mudenge, present in this country as representatives of the Government of Zimbabwe to the United Nations Millennium Summit at the time they were served, are also entitled to diplomatic immunity under the Convention on Privileges and Immunities of the United Nations [167] and the Vienna Convention on Diplomatic Relations.[168] Article IV, Section 11 of the U.N. Convention provides that temporary representatives of Member States to United Nations bodies and conferences accredited for those limited purposes are entitled to the privileges and immunities enjoyed by diplomatic envoys. Similarly, Article 31(1) of the Vienna Convention provides that diplomatic agents enjoy comprehensive immunity from civil jurisdiction.

Immunity extends to such temporary representatives throughout the course of their United Nations visit and applies from the time of entry into the United States until departure or expiration of a reasonable period following conclusion of their United Nations business.[169] The Government contends that pursuant to the Diplomatic Relations Act [170], an action against an individual who is entitled to immunity shall be dismissed where immunity is established "upon motion or suggestion by or on behalf of the individual." [171]

Plaintiffs counter that subsection 11(a) of the U.N. Convention confers a limited form of diplomatic immunity that does not apply to Mugabe and Mudenge in this case. Specifically, subsection 11(a) states

---

**166.** *See Aristide*, 844 F.Supp. at 138 (citing Sen. Comm. on the Judiciary, The Torture Victim Protection Act of 1991, S.Rep. No. 249, 102d Cong. 1st Sess. 7–8 (1991)) ("The TVPA is not intended to override traditional diplomatic immunities which prevent the exercise of jurisdiction by U.S. courts over foreign diplomats .... Nor should visiting heads-of-state be subject to suits under the TVPA.").

**167.** *Adopted* Feb. 13, 1946, *United States accession*, April 29, 1970, 21 U.S.T. 1418, 1 U.N.T.S. 16 (hereinafter the "U.N. Convention").

**168.** *Done* April 18, 1961, *United States accession*, December 13, 1972, 23 U.S.T. 3227, 500 U.N.T.S. 95 (hereinafter the "Vienna Convention").

**169.** *See* Vienna Convention, Article 39(1) and (2).

**170.** 22 U.S.C. § 254a, *et seq.*

**171.** *Id.* at § 254d. The Court notes that under Article 10 of the Vienna Convention, the State Department may certify foreign diplomatic agents even after the official has entered the country and that under Article 39, the agents are entitled to immunity at the moment of notification to the appropriate authorities of the receiving state, even if they have already entered the territory. *See Republic of Philippines*, 665 F.Supp. at 799 (citing *Abdulaziz v. Metropolitan Dade County*, 741 F.2d 1328, 1331 (11th Cir.1984)).

that representatives of member states to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations, shall, "while exercising their functions and during their journey to and from the place of meeting," enjoy:

(a) immunity from personal arrest or detention and from seizure of their personal baggage, and, in respect of words spoken or written and all acts done by them in their capacity as representatives, immunity from legal process of every kind.[172]

According to Plaintiffs, this provision does not grant Mugabe and Mudenge the absolute immunity from civil jurisdiction asserted by the Government, but accords protection from suit only in respect to any conduct taken by them in their capacity as temporary representatives to the United Nations. Thus, because the offenses alleged here were not committed by Mugabe and Mudenge while engaged in that limited official role, subsection 11(a) of the U.N. Convention would not immunize their personal conduct.

The Government, however, replies that subsection 11(g) of the U.N. Convention also applies here to support its diplomatic immunity theory. That provision, following the enumeration that precedes it under the heading of Section 11, states that the temporary officials covered shall receive "such other privileges, immunities and facilities not inconsistent with the foregoing as diplomatic envoys enjoy." In the Government's reading, it is not incompatible with subsection 11(a) to grant the immunities subsection 11(g) provides, so long as such additional immunities are not expressly excluded by Section 11.

But Plaintiffs read subsection 11(g)'s "not inconsistent" reference as a limitation

to the scope of Section 11 as a whole. In Plaintiffs' view, those qualifying words would contradict subsection 11(a) if interpreted to grant absolute immunity for all conduct, though subsection 11(a) confers immunity only for words spoken or written or other acts taken by officials in the course of discharging their duties as temporary representatives to the United Nations. In other words, on this theory only things said and done arising from the particular event temporary delegates are attending would be protected. So construed, the broader immunity enjoyed by accredited diplomats and principal resident representatives to the United Nations encompassing other times, places and subjects would not extend to the temporary envoys covered by Section 11.

The Court is not persuaded by Plaintiffs' interpretation of Section 11. That reading too narrowly constricts the immunity contemplated by the U.N. Convention to ensure the freedom and independence temporary delegates require to fulfill their responsibilities effectively. Specifying that immunity from legal process applies to words spoken or written and acts performed by temporary representatives in an official capacity underscores that at least those actions are protected by immunity. In fact, Section 12 of the U.N. Convention highlights the significance of this immunity by specifying that it continues to be enjoyed by the covered temporary envoys even after they cease serving in their capacities as delegates. Though, if read technically and in isolation, the language of subsection 11(a) could suggest that immunity as regards all other acts of temporary delegates would be precluded, such an exclusion could not have been contemplated in light of the enlargements of immunity evident elsewhere in the U.N. Convention.

**172.** U.N. Convention, § 11(a).

First, that interpretation would create an internal textual conflict between the captional language of Section 11 that refers to "while exercising their functions" and the limitation Plaintiffs read into the "capacity as representatives" provision of subsection 11(a). It is clear that the "while exercising their functions" clause in the heading could encompass a broader range of activities than those of the official capacity language of the subsection. In discharging their narrowly defined official duties as delegates to a given event, temporary representatives to United Nations organs and conferences generally attend meetings and make speeches. But they also may be designated by their governments to perform related functions that may extend beyond the strict confines of the particular gathering.

In practice, ancillary to their narrower duties, temporary envoys may be assigned to represent their governments at other diplomatic, ceremonial and goodwill missions and bilateral conferences that typically occur at the margins of United Nations events and contribute to their success. Exercising duties associated with such attendant activities may be encompassed by the broader band of the "functions" referred to by the language at the head of Section 11 and covered by immunity under subsection 11(g), even if the acts in question may not arise from within the narrow corners of the delegates' capacities strictly connected with attending meetings of a specified United Nations body or conference encompassed by subsection 11(a).

Moreover, the language in the heading of Section 11 also specifies that the special representatives enjoy immunity "during their journey to and from the place of meeting".[173] At such times, for example, upon arrival in or departure from the United States, the delegates presumably would not yet be performing any acts in their capacities as representatives as contemplated by subsection 11(a), though they nonetheless would be entitled to the specified immunity during that period of travel. On Plaintiffs' reading of subsection 11(a), temporary envoys theoretically would be subject to domestic civil jurisdiction in connection with any matter unrelated to their official duties at the moment they set foot in the host country and before they have had any opportunity to exercise any functions as delegates.

Second, the narrower interpretation of Section 11 would create anomalies and absurd results. United Nations ambassadors accompanying their heads-of-state or foreign ministers to a function would enjoy broader immunities than accorded to their superior officers, even though in reality the latter as temporary representatives may be charged with larger duties related to the United Nations event at issue, and though, theoretically, under the customary rules governing immunity, as heads-of-state and foreign ministers, some of them would be entitled to broader exemption from territorial jurisdiction.[174]

Moreover, reading subsection 11(a) to authorize service of process upon temporary representatives at any moment they are not engaged in acts strictly connected with the representatives' limited capacity as conference delegates, or at any place they take a step beyond the borders of the designated United Nations district, would encourage litigants and their process-servers to pursue the delegates and lie in wait to seize upon the first departure from the narrow protocol, thereby potentially dis-

---

173. U.N. Convention, § 11.

174. *Satow's Guide,* at 9–10; *see Restatement (Third) of Foreign Relations Law* § 464, Reporter's Note 14.

couraging the designation of particular temporary envoys and defeating the purposes of Section 11.

The net effect of Plaintiffs' construction of Section 11 would be to equate the privileges and immunities enjoyed by temporary delegates of United Nations member states with those accorded to invitees of the United Nations. The latter, who may include private persons as well as government officials, travel to the United Nations at the invitation of the organization and not as representatives of the member states or necessarily in their public capacities. The privileges and immunities accorded to invitees are narrower than those enjoyed by permanent and temporary United Nations envoys who represent the states, and are separately set forth in the Headquarters Agreement. Section 9(a) of the Headquarters Agreement limits the invitees' protection from service of process strictly to the confines of the United Nations district.[175]

The Court finds that the broader reading of Section 11 better comports not only with the text, but, as the Government points out, with the history of the U.N. Convention's adoption by the United States. Because the language of the treaty is not as unambiguous as Plaintiffs contend,[176] consideration of the legislative record is appropriate.[177] The report accompanying the Senate's advice and consent to ratification of the U.N. Convention makes clear that in adopting the treaty the United States understood it was extending the privileges and immunities enjoyed by temporary representatives of Member States to the level of protection conferred upon accredited diplomats.[178]

**175.** *See* 22 U.S.C.A. § 287 Note; *Kadic*, 70 F.3d at 247; *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 54 (2d Cir.1991).

**176.** *See* Yu–Long Ling, *A Comparative Study of the Privileges and Immunities of United Nations Member Representatives and Officials with the Traditional Privileges and Immunities of Diplomatic Agents*, 33 Wash. & Lee L.Rev. 91, 112 (1976) (hereinafter "Ling") (noting that members of one of the United Nations standing committees had expressed concern that subsection 11(g) of the U.N. Convention appeared ambiguous).

**177.** *See Massachusetts v. Morash*, 490 U.S. 107, 114–15, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (in statutory construction the courts are "not ... guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy"); *see also Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 25, 109 S.Ct. 278, 102 L.Ed.2d 186 (1988) ("the meaning of words depends on their context").

**178.** *See* Report of the Committee on Foreign Relations, Exec. Rept. 91–17, 91st Cong. (March 17, 1970) (hereinafter "Exec. Rept."). This understanding was expressly conveyed by the State Department Legal Adviser, John R. Stevenson, at hearings before the Foreign Relations Committee on March 9, 1970. Describing the effect the Convention would have on privileges and immunities for nonresident representatives, the official stated:

> At the present time resident representatives are already granted full diplomatic privileges and immunities under the headquarters agreement. Nonresident representatives, on the other hand, are only covered by the International Organizations Immunities Act and that grants them immunities relating to acts performed by them in their official capacity.
> Under the convention, the nonresident representatives would also receive full diplomatic privileges and immunities.
> The Chairman [Senator Fulbright]: They are the principal beneficiaries; is that right?
> Mr. Stevenson: They are in terms of numbers the principal beneficiaries. There are about 1,000 of them who would be covered who are not now.
> As Ambassador Yost [then the U.S. Permanent Representative to the United Nations] pointed out, many of the nonresident representatives are distinguished parliamentarians who come to New York for very short periods of time and we believe should be treated with the same respect as permanent representatives.

The Executive Branch's view that the U.N. Convention broadened immunities for temporary envoys to the United Nations so as to make them coextensive with those of resident representatives and accredited diplomats was unambiguously expressed by the Senate Committee:

> With regard to representatives of members, currently only resident representatives of permanent missions to the U.N. have full diplomatic immunities. Nonresident representatives enjoy only functional immunities; that is, immunities with respect to their official acts. *Under the convention, these nonresident representatives will also be entitled to full diplomatic immunities. The group covered here consists of foreign officials coming to the United Nations for a short time to attend specific meetings—such as the annual fall meetings of the General Assembly. Foreign ministers and other high government officials, distinguished parliamentarians, and representatives of that caliber, fall into this category,* which is estimated to number about 1,000 persons a year.[179]

Heads-of-state and foreign ministers are precisely the types of officials who visit the United Nations for temporary purposes to attend conferences and special activities and who are contemplated by this language as being afforded "full diplomatic immunities" under the Convention. In fact, the customary diplomatic practices of heads-of-state and foreign ministers also illustrate the point that in "exercising their functions" as contemplated by Section 11, they rarely confine their roles as temporary representatives solely to the narrower capacities of the particular conference. Rather, they typically engage in a wide range of associated diplomatic missions and ceremonial events that the opportunity affords, activities that substantially foster and enhance the purposes of the underlying United Nations conference or session.[180] Here, Mugabe and Mudenge, at the time they were served, were engaged in exactly the type of visit "for a short time to attend specific meetings"[181] at the United Nations that the United States intended to render absolutely immunized.[182]

This legislative record conveys unequivocally that both the Executive Branch and the Senate intended that Section 11 of the U.N. Convention would confer full diplomatic immunity to temporary representatives to the United Nations. This understanding also accords with the reading and application of Section 11 by officials of the United Nations. The United Nations Secretary–General, as reflected in opinions of the organization's Legal Counsel, adopts a "broad" interpretation of Section 11's phrase "while exercising their functions" that is consistent with this Court's reading of the text and that effectively rejects the narrow view Plaintiffs espouse.[183] In one opinion, for example, the Legal Counsel advised that "[i]n the view of the Secretary–General, to interpret those words so as to limit them to the times when the

*Id.* at 11–12.

179. *Id.* at 3 (emphasis added).

180. *See generally, Satow's Guide,* at 312–13.

181. Exec. Rept., at 3.

182. In fact, then-Ambassador Yost had underscored this point in addressing the Senate Foreign Relations Committee:

> I have long feared that a visiting dignitary to the United Nations might some day be involved in difficulties not of his own making and that the U.S. Government would be powerless to accord him the privileges which would be appropriate and which would be expected of us. Our ratification is long overdue.

*Id.* at 11.

183. *See 1976 U.N. Juridical Yearbook,* at 228.

person concerned is actually doing something as part of his functions as a representative, for example, speaking in a United Nations meeting, leads to absurd and meaningless results making such an interpretation untenable." [184] The opinion concluded that, "taken as a whole, Section 11 of the Convention in fact confers, except for the exemptions [regarding payment of customs and taxes] just mentioned, diplomatic privileges and immunities on the representatives of Members." [185]

 Because the United Nations and its Member States operate on a global scale, it is essential that the U.N. Convention is given uniform interpretation and application in all countries where it is in effect. For this reason alone, courts should defer to the interpretation of the U.N. Convention adopted by the United Nations and evinced by the United States Congress when it ratified the Convention. As the Supreme Court has declared,[186] "[w]hen the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, [the court] must, absent extraordinarily strong contrary evidence, defer to that interpretation." This Court has found no extraordinarily strong evidence here suggesting that the interpretation of Section 11 the United States advances is not entitled to deference. Accordingly, the Court concludes that both Mugabe and Mudenge enjoyed diplomatic immunity at the time they were served and that the Court therefore lacks a basis for exercise of jurisdiction over them.

184. *Id.*

185. *Id.* at 227.

186. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 185, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982); *accord, Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) ("[T]he meaning given [treaty provisions] by the departments of gov-

## III. *PERSONAL INVIOLABILITY*

Plaintiffs contend that even if head-of-state. or diplomatic immunity shielded Mugabe and Mudenge from the Court's jurisdiction, such protection does not extend to ZANU–PF and that a default judgment should be entered in this action against that political entity because the organization was properly served with process through the personal service effectuated on Mugabe and Mudenge in their capacities as senior officers of the party. On Plaintiffs' theory, because the U.N. Convention immunizes foreign officials from service only for suits based on official acts associated with their United Nations visit, and not from unrelated private actions such as those involving ZANU–PF, personal inviolability would not apply to preclude service of process on Mugabe and Mudenge. The Government responds that both head-of-state and diplomatic immunity render Mugabe and Mudenge absolutely inviolable for all purposes, so that service of process on them, even that intended for ZANU–PF, was a nullity and should be quashed.

Indisputably, personal inviolability goes to the core of diplomatic immunity. Inviolability is a venerable principle, its essence and enduring roots articulated by a leading treatise:

Personal inviolability is of all the privileges and immunities of missions and diplomats the oldest established and the most universally recognized . . . . The

ernment particularly charged with their negotiation and enforcement is given great weight."); *767 Third Avenue Assocs. v. Permanent Mission of Zaire,* 988 F.2d 295, 301–02 (2d Cir.1993) ("federal courts must defer" to treaty interpretation advanced by United States and not contradicted by any signatory to the treaty).

inviolability of ambassadors is clearly established in the earliest European writings on diplomatic law and from the sixteenth century until the present one can find virtually no instances where a breach of a diplomat's inviolability was authorized or condoned by the Government which received him.[187]

When Congress enacted the Diplomatic Relations Act [188] to implement the Vienna Convention, it established the applicable law on the subject in the United States. The Vienna Convention provides full personal diplomatic inviolability, stating simply that "[t]he person of a diplomatic agent shall be inviolable." [189] The principle of personal inviolability extends its privileges and immunities to visiting heads-of-state as an aspect of head-of-state immunity.[190]

The Government seeks to expand upon these settled principles. It argues that the scope of inviolability to which foreign officials are entitled effectively confers absolute immunity, not only from exposure to litigation and legal compulsion, but from all service of process. The Government further maintains that the service of process is an assertion of jurisdiction and is thus precluded as to persons who enjoy immunity from the Court's jurisdiction because if personal jurisdiction is lacking, then service of process is void.[191] Moreover, the Government asserts that "the State Department considers that personal inviolability under Article 29 of the Vienna Convention precludes the service of compulsory legal process on diplomatic agents." [192] Consequently, while the State Department's Suggestion of Immunity does not purport to assert immunity on behalf of ZANU–PF, and the Government has not maintained in this proceeding that ZANU–PF is entitled to invoke any form of immunity from the exercise of the Court's jurisdiction, the Government's inviolability theory effectively would achieve the same result by indirectly shielding ZANU–PF, under the cover of Mugabe's head-of-state immunity, from the reach of territorial jurisdiction.

These respective arguments raise a threshold issue: the meaning and scope of the concept of diplomatic inviolability. The Vienna Convention articulates the standard in this regard. It provides that

[t]he person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.[193]

The principle is rooted in the traditional concept that diplomats, serving in a foreign and potentially hostile land as surrogates of their sovereign, required appropriate protections, and that any attack on or offense to them similarly constituted an

---

187. *Satow's Guide,* at 120; *see also* Sen, *A Diplomat's Handbook of International Law and Practice* 107 (3d ed.1988) (hereinafter *"Diplomat's Handbook"*).

188. 22 U.S.C. § 254a *et seq.*

189. Vienna Convention, Article 29.

190. *See Restatement (Third) of Foreign Relations Law* § 464, Reporters' Note 14 ("When a head of state or government comes on an official visit to another country, he is generally given the same personal inviolability and immunities as ... an accredited diplomat."); *Satow's Guide,* at 9.

191. *See Aidi v. Yaron,* 672 F.Supp. 516, 517 (D.D.C.1987); *see also Aristide,* 844 F.Supp. at 130.

192. Gov't Reply, at 34.

193. Vienna Convention, art. 29.

affront to the ruler they represented.[194] Inviolability of the diplomat's person therefore became essential "in order to allow him to perform his functions without any hindrance from the government of the receiving state, its officials and even private persons." [195]

The limited case law addressing the concept of inviolability generally involves actions that entail detention; searches of the person, baggage or premises; subpoenas to provide evidence at legal proceedings; and civil or criminal actions brought directly against diplomats who then assert immunity.[196] Neither Plaintiffs nor the Government has produced any precedent addressing the precise issue presented here: whether inviolability would extend to preclude service of process on foreign officials entitled to head-of-state or diplomatic immunity when service is effected on them for purposes not involving an assertion of personal jurisdiction against such officials, but is directed against an affiliated non-governmental third person or entity on whose behalf they may be served. The Court's own research has uncovered no case exactly on point or sufficiently analogous as regards either head-of-state or diplomatic immunity. Nonetheless, the Government, without citing any authority or even pre-FSIA practices, asserts that inviolability works to bar even such purported exercises of jurisdiction. On this point, the Court parts company with the Government's view.

■ Whatever may be the remnants of post-FSIA common law foreign immunity as to heads-of-state, the Court is not persuaded that the doctrine reaches to the outer bounds the Government advances as regards Plaintiffs' action against ZANU–PF. From the analysis of sovereign immunity detailed above, it is clear that insofar as head-of-state immunity branched into a distinct doctrine since the enactment of the FSIA, whatever judicial support exists for the proposition that some stem of common law immunity survived the FSIA, that exception applies only to protect a recognized sitting head-of-state from suit and potential liability. The judicial deference accorded to State Department suggestions of immunity extends to honor the Executive Branch's determinations concerning which particular foreign ruler is a recognized head-of-state and what acts of his are strictly governmental and thereby entitle the official to claim personal immunity from territorial jurisdiction. Nothing in the evolution of the common law doctrine suggests that the exception also encompassed conferring upon the State Department the function of defining the full reach of the concept of inviolability as it pertains to heads-of-state.

Indeed, as discussed above, just how far beyond the original predicate the scope of head-of-state immunity may be carried, given the numerous uncertainties and the formative state of the doctrine, is subject to doubt and debate. Substantial questions remain unsettled, for example, concerning precisely which foreign officials may invoke the immunity; whether the doctrine applies solely to the head-of-state or government; or whether it may be enlarged to protect other persons or entities.[197] Similarly, as the Second, Fourth and Ninth Circuits have intimated, head-of-state immunity from suit may not necessarily equate under all circumstances to immunity from offering testimony at a de-

---

**194.** *See Diplomat's Handbook,* at 107.

**195.** *Id.; see also Satow's Guide,* at 120–21.

**196.** *See generally* Ling, 33 Wash. & Lee L.Rev. at 104–31.

**197.** *See supra* Part I.B.4.c.

position or trial.[198] These open issues represent interstices in the law that must be filled by reasoned judicial interpretation in the light of experience and by sound application of the emerging common law, rather than by reflexive expansion of the Executive Branch's categorical reading of a limited doctrinal exception. In view of the flux and uncertainties surrounding the matters in question, and absent more settled law on point, this Court is not persuaded that the principle of personal inviolability would encompass the lengths to which the Government's assertion in the matter at hand would enlarge it.

■ While the Government here and in other cases has offered valid grounds for the courts to honor the State Department's suggestions of immunity and defer from exercising jurisdiction over a recognized sitting head-of-state that would subject the foreign official to be hauled into court and potentially be exposed to personal liability, the Court finds uncompelling the further contention that the doctrine requires courts to give conclusive effect to the State Department's advice with regard to the appropriateness of service of process upon a head-of-state as it arises in this case. Several considerations weigh against such a proposition.

■ First, the head-of-state doctrine as a residual branch of common law sovereign immunity addresses the personal immunity of the ruler. Nothing in the history of the principle suggests that it also worked indirectly to extend derivative immunity to private entities or non-governmental ventures with which the head-of-state may be associated. Thus, though under the common law rules the Court may be bound to accord conclusive effect to a suggestion of immunity filed on behalf of a recognized head-of-state to avert an exercise of personal jurisdiction over the sovereign, it is not similarly obliged to honor an assertion of immunity whose intended beneficiary, expressly or impliedly, is a private third person or organization not associated with the head-of-state in any governmental or familial connection, when the practical effect of the immunity claim is to cloak such a party from domestic civil jurisdiction.

Second, it is incontestable that arrest, detention, searches, taxation or any form of legal compulsion asserted directly against a foreign state leader or diplomat not only serve to create hindrances to the performance of the foreign official's functions, but constitute affronts to both the person and dignity of the ruler and to the sending foreign state. These practices also run counter to comity and invite reciprocal measures harmful to harmonious relations among nations. While these concerns provide the justification for the principle of inviolability, they do not arise to the same extent in connection with the service of process upon a foreign state official intended to effectuate jurisdiction concerning matters and parties collateral to the head-of-state's or diplomat's official status. Service of process under these circumstances would not demand the official's appearance in court nor subject him in other ways to the court's compulsory powers in a manner that could be deemed an assertion of territorial authority over the foreign dignitaries and, by extension,

---

**198.** *See In re Doe,* 860 F.2d at 44–45; *In re Grand Jury Proceedings,* 817 F.2d at 1111 ("The issue in this case, however, is not whether the Marcos' may be civilly liable, but whether they are wholly immune from process."); *Estate of Domingo,* 808 F.2d at 1350; *see also Lasidi,* Nat'l L.J., Aug. 29, 1983 at 1, col. 1 (conditioning assertion by a head-of-state of a counterclaim in a dispute involving the ruler's private financial investments upon his agreement to submit to a deposition).

over the foreign state they represent. Grounds to give affront to the person or dignity of the foreign official, or to interfere with the officer's governmental functions, do not arise in this context, or may do so only minimally or to a degree substantially outweighed by other interests of justice.

In this case, for example, it is ZANU–PF institutionally, rather than Mugabe or Mudenge personally, to which the exercise of the Court's jurisdiction applies; it is ZANU–PF, not Mugabe or Mudenge, which is called to answer to the notice of process served upon Mugabe and Mudenge as senior officers of ZANU–PF. In this regard, it is pertinent that the process served on Mugabe and Mudenge did not relate to a matter or third party with which they were unconnected. Rather, the complaint identifies Mugabe as First Secretary and President of ZANU–PF and Mudenge as a senior officer of the party. Service on them was designed to reach an unofficial organization whose political function they were attending and whose purpose, according to Plaintiffs' uncontested assertions, was to raise funds for ZANU–PF in this country, to elicit political support for Mugabe's regime and to blunt domestic attacks on his policies. Given this context, it would not be unexpected that such integral ties to and use of private entities by foreign state officials could supply grounds to justify, if not the exercise of

personal jurisdiction over them, at least the service of process intended to challenge wrongful actions of the particular organization with which they are closely associated and whose bidding they were doing at the time of service.

Second, under practices pursuant to both the Tate Letter policy and the FSIA, the immunity recognized for foreign states did not conclusively eliminate service of process upon individual representatives of their governments, even if they otherwise happen to enjoy diplomatic immunity in connection with their own actions, as regard the matters the Act specifically exempted from foreign state immunity. Pursuant to § 1608(b)(2) of the FSIA, if suit is brought against an agency or instrumentality of a foreign state, service may be effected "by delivery of a copy of the summons and complaint whether to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States." [199] Nothing in the statute would bar service in an action properly arising under the Act to be made on an officer or general agent of the foreign state who also happens to be a state official or diplomat otherwise entitled to immunity—theoretically including even a head-of-state who satisfies the statutory criteria defining the persons upon whom service is authorized to be made.[200] Thus, the procedural provisions of the FSIA

199. 28 U.S.C. § 1608(b)(2); *see also Bowers ex rel. NYSA–ILA Pension Trust Fund v. Transportes Navieros Ecuadorianos (Transnave)*, 719 F.Supp. 166, 170 (S.D.N.Y.1989) (service properly effected on defendant's agent in the United States pursuant to § 1608(b)). In addition, service of process pursuant to other statutory regimes clearly permit service in some circumstances upon foreign officials who may enjoy some form of immunity. Section 311(a) of the New York Civil Practice Law and Rules, paralleling FSIA § 1608(b)(2), contemplates personal service upon a foreign corporation by direct delivery to an officer, director or general agent.

200. *See Klinghoffer*, 937 F.2d at 54 (noting that service of process upon the Palestine Liberation Organization's Permanent Observer to the United Nations may be appropriate, as that official, though otherwise entitled to limited immunity at the United Nations, also performed functions comparable to those of a general agent for purposes of service of process under federal procedure).

seem to contemplate and legitimize the point that the doctrine of inviolability does not serve as an absolute barrier to the service of process in certain limited circumstances.

In applying the evolving doctrine of common law head-of-state immunity, this Court is mindful of another concern. Vigilance is essential to ensure that the type of misuse of sovereign state immunity that impelled the enactment of the FSIA does not tiptoe into the application of head-of-state doctrine. Just as states once employed corporate forms, shielded by sovereign immunity to engage in essentially private enterprise, heads-of-state should not assert the emerging doctrine, that immunizes them personally from the exercise of territorial jurisdiction, to extend their protection from liability, under the mantle of inviolability, to non-state individuals and entities used as agents and conduits to execute private wrongful actions.

Third, other principles and practices of international law confirm that the concept of inviolability is not absolute; widely recognized exceptions to it do exist. As Chief Justice Marshall acknowledged in *The Schooner Exchange*, circumstances do arise where, for instance, by acquiring property in a foreign country, a head-of-state could be considered to have subjected that property to territorial jurisdiction and himself to that limited degree to have assumed the character of a private individual.[201] Reflecting this principle, well-settled practices of customary international law hold that inviolability would not apply to bar civil jurisdiction over foreign rulers or diplomats in actions involving their real property abroad, or their private services as executors of an estate, or other unofficial professional or commercial activities.[202]

Recognition of these exceptions presupposes that to obtain personal jurisdiction over the head-of-state or diplomat in connection with the particular actions, they would have to be amenable to service of process. Consequently, to this extent the doctrine of inviolability would not preclude service of process upon a foreign head-of-state or diplomat. Failure to validate process in these situations would defeat the purposes of the noted exceptions.

Implicitly conveyed by the exceptions is that service of process per se does not offend the concept of personal inviolability. Rather, in the limited context described, process is permitted because it does not implicate the concerns over comity and affront to the person or dignity of the head-of-state or diplomat even under circumstances where the exercise of jurisdiction over the person, and conceivably the presence of the official in court or the court's compulsion over the person, may be demanded. The exceptions also reflect a recognition that in these limited circumstances the foreign rulers or diplomats, by engaging in certain private activities in the foreign state, could be deemed to have understood, and in some measure impliedly or expressly accepted, the piercing of their shield of inviolability. In a similar vein, by engaging in non-governmental activities abroad on behalf of private entities or enterprises with which they may be closely affiliated, foreign officials otherwise entitled to immunity could be considered to have subjected themselves to the service of process intended for the entity or enterprise at issue, even if the officials themselves continue to enjoy immunity as to their own persons.

---

**201.** *See The Schooner Exchange,* 11 U.S. (7 Cranch) at 145.

**202.** *See* Vienna Convention, Article 31; *Satow's Guide,* at 10; *Diplomat's Handbook,* at 118.

This proposition, in fact, parallels the development of exemption of foreign states from sovereign immunity in connection with activities that are strictly commercial as opposed to governmental. The exception, though recognizing immunity for the state itself, precludes the state's functionally private entities from invoking sovereign immunity to escape liability for wrongs arising from their commercial transactions. If under current practice a foreign head-of-state or diplomat may, consistent with personal inviolability, become personally and fully subject to the civil jurisdiction of another sovereign in some situations, it would not offend the principle to permit service of process upon such an official in a context that is narrower and less intrusive—that is, one in which service is intended for a private entity or enterprise with which the official is closely associated, where no hindrance to the official's exercise of governmental or diplomatic functions otherwise results.

In sum, however ancient and royal the pedigree of the inviolability doctrine may be, this Court finds no basis to conclude that the rule extends to confer absolute immunity from service of process where a head-of-state or diplomat would not be subjected personally to a foreign court's jurisdiction nor exposed to liability in that court. Modern realities have done much to demystify the figure of the head-of-state and to lay bare some of the ancient myths about the emperor's garb that cloaked the sovereign's conduct in divine fictions and absolutes.

In modern times, through the worldwide spread of democracy and its leveling concepts of equality, we have come to realize that rulers of states are human after all, subject to all human drives, predilections and foibles. They have private lives, in the course of which on occasion they stray from expected norms and are capable of abusing power and betraying their public trust. And when sovereigns assume human form and come down to earth, as did the gods of myths and kings of old, they do mundane things—the kinds of things ordinary mortals routinely do. They engage in political affairs. They enter personal relationships. In pursuit of private gains, they undertake financial transactions and commercial ventures. In doing so, they may act personally or indirectly, as individuals or through surrogate entities or enterprises, by either means sometimes transcending public ends, their transgressions causing wrongs to people they encounter along the way.

In this manner, leaders of nations evince that personal dignity is a two-faced thing. The public face whose appearance the law goes to great lengths to protect against affronts is sometimes sullied and diminished by the leader's own hand through dark deeds that soil the private face. For these reasons, there is growing acceptance for a rule of law that reaffirms that no person is above the law. And it should come as no surprise to heads-of-state and other high-ranking public officials that in some way at some point even they may be called upon to play a role in the public's quest for accountability for their privately inflicted harms. To this greater good, acceptance of process on behalf of their surrogate entities or agents is the minimum contribution that heads-of-state can make in advancing the interests of larger justice. In this way, an overarching end may be achieved at negligible sacrifice of the leader's public dignity perhaps already stained, and without hindrance to the performance of governmental roles.

This practice accords with principles recognized in this country. Under similar circumstances, the Supreme Court has carved considerable substance from the old categorical immunity barriers. It estab-

lished in *United States v. Nixon*[203] that even a sitting President may not assert immunity from a criminal subpoena, and in *Clinton v. Jones*[204] that official immunity would not bar a private civil lawsuit from proceeding against a President still in office. Globally, the inroads made by the community of nations in defining, asserting jurisdiction and prosecuting heads-of-state and other high-ranking government officials in connection with certain international crimes, have far-reaching implications. This evolution of events and the corresponding principles it has spawned, if not jettisoning head-of-state immunity altogether, persuades this Court of at least this much: that no sufficient grounds exist in statutes, legislative history, case law or principles of international comity for extending the doctrine of inviolability to deny recognition of the process served on Mugabe and Mudenge on behalf of ZANU–PF under the unique circumstances present here.

## IV. *JURISDICTION*

### A. *PERSONAL JURISDICTION*

Concluding its review of personal jurisdiction over ZANU–PF, the Court considered Plaintiffs' assertions that ZANU–PF and its senior officers were present in the

United States "availing themselves and their property of the security and sanctuary of the United States and the state of New York engaging in press and other activities."[205] They further allege that at the time process was served on Mugabe and Mudenge on behalf of ZANU–PF, these officials, in their capacities as senior officers of ZANU–PF, were attending a political function sponsored by the "Friends of ZANU–PF" whose purpose was to rally support for ZANU–PF and Mugabe's regime. Accepting these allegations to constitute sufficient minimal contacts to satisfy due process concerns for jurisdictional purposes and recognizing the validity of Plaintiffs' service of process on ZANU–PF as giving adequate notice of this action, the Court concludes that the basic prerequisites for its exercise of personal jurisdiction over ZANU–PF have been fulfilled so as to allow the action to proceed as against ZANU–PF and Plaintiffs' motion for default judgment to be granted.

### B. *SUBJECT MATTER JURISDICTION*

Substantively, Plaintiffs claim that their causes of action arise under the ATCA,[206] the TVPA,[207] the general federal-question jurisdictional statute[208], as well as various

**203.** *See* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

**204.** *See* 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997).

**205.** Compl. ¶ 11. The Complaint does not further elaborate on how extensive, systematic or continuous ZANU–PF's activities were in New York or the United States. Given ZANU–PF's default, however, any deficiency in and objection to personal jurisdiction on these grounds are deemed waived. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 705, 102 S.Ct. 2099, 72 L.Ed.2d 492 ("[T]he failure to enter a timely objection to personal jurisdic-

tion constitutes, under Rule 12(h)(1), a waiver of objection.").

**206.** 28 U.S.C. § 1350.

**207.** Pub.L. 102–256, 106 Stat. 73 (Mar. 12, 1992) (codified at 28 U.S.C. § 1350 Note).

**208.** *See* 28 U.S.C. § 1331. Because the Court rests its resolution of this matter on the other grounds asserted, it does not address the § 1331 basis, as to which considerable uncertainty exists. *See Kadic,* 70 F.3d at 246; *Filartiga,* 630 F.2d at 888 n. 22; *see also Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 779–80 (D.C.Cir.1984) (Edwards, J., concurring), *cert. denied,* 470 U.S. 1003, 105 S.Ct.

sources defining fundamental norms of international law.[209] For the purposes of this proceeding, the Court finds that the ordeals of torture, extrajudicial killings and other atrocities which Plaintiffs assert characterized the campaign of lawlessness and terror ZANU–PF inflicted upon them fall within the scope of the conduct encompassed by the TVPA and violations of international law cognizable under the ATCA. The Court finds sufficient support for this conclusion in case law sustaining claims grounded on acts characterized by similar lawlessness and extreme brutality found to have breached recognized international standards.[210]

██ Whether liability properly could be imposed upon ZANU–PF for its role in these wrongs raises substantial questions that merit consideration and comment at this point. Though not specifically addressed by the parties before the Court, a

---

1354, 84 L.Ed.2d 377 (1985); *Xuncax*, 886 F.Supp. at 193–94; *but cf. Abebe-Jiri v. Negewo*, No. 90 Civ.2010(GET), 1993 WL 814304 (N.D.Ga.1993), *aff'd*, 72 F.3d 844 (11th Cir. 1996), *cert. denied*, 519 U.S. 830, 117 S.Ct. 96, 136 L.Ed.2d 51; *Forti v. Suarez–Mason*, 672 F.Supp. 1531, 1544 (N.D.Cal.1987).

**209.** *See* Compl. ¶ 10 (specifically citing "among others, the 1949 Geneva Conventions, Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, United Nations Charter, Universal Declaration of Human Rights, and the International Covenant on Civil and Political Rights."). The Court notes that Plaintiffs' complaint repeatedly characterizes the conduct ascribed to ZANU–PF and the other defendants as a campaign of terrorism. *See* Compl. ¶¶ 1, 2, 4. Plaintiffs, however, do not specifically base any of their substantive claims on violations of international law relating to terrorism, nor do they cite to any relevant international instrument on this subject. The Court therefore does not address these issues, for the additional reason that in this area clearly established definitions or widely recognized principles have yet to emerge. *See, e.g., Tel–Oren*, 726 F.2d at 795, where Judge Edwards noted in his concurrence: "[w]hile this nation unequivocally condemns all terrorist attacks, that sentiment is not universal. Indeed, the nations of the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of harmony or consensus."

Nonetheless, terrorism has been the subject of several institutional statements of condemnation by the international community, and of regional and conduct-specific conventions. In this regard, momentum towards a rule of international law proscribing terrorism is gaining, just as carefully-planned, well-financed acts of terror with devastating consequences are also on the rise. *See, e.g., G.A. Res. 40/61, reprinted in*, 25 I.L.M. 239 (1986) (the United Nations General Assembly "[u]nequivocally condemns, as criminal, all acts, methods and practices of terrorism wherever and by whomever committed, including those which jeopardize friendly relations among States and their security."); Convention for the Suppression of Unlawful Seizure of Aircraft, *done* December 16, 1970, *ratified* September 14, 1971, 22 U.S.T. 1641; United Nations: International Convention for the Suppression of Terrorist Bombing, *opened for signature* January 12, 1998, *entered into force* May 23, 2001, 37 I.L.M. 249 (1998). Although the United States is a signatory, it has not yet ratified the Convention on Terrorist Bombings. As of the date of this Decision and Order, there are 58 signatories and 29 parties to the Convention. *See also* S.C. Res. 1373 (September 28, 2001) (the Security Council, in reaffirming its unequivocal condemnation of the terrorist attacks which took place on September 11, 2001 in New York, Washington, D.C. and Pennsylvania, declared that it regards such acts, like any act of international terrorism, to constitute a threat to international peace and security, and it urged states, among other measures, to prevent and suppress the financing of terrorist acts, to criminalize the provision of financial support for terrorists, to freeze their assets and to refrain from providing any form of safe haven or support to entities or persons involved in terrorist acts).

**210.** *See Kadic*, 70 F.3d at 237; *Hilao*, 25 F.3d at 1475; *Filartiga*, 630 F.2d at 878–79; *Cabiri*, 921 F.Supp. at 1191; *Xuncax*, 886 F.Supp. at 169–71, 179.

significant issue arises with respect to the applicability of the ATCA and the TVPA to ZANU–PF. ZANU–PF's liability under the ATCA and TVPA rests on the extent to which statutes authorizing causes of action grounded on violations of international law apply to private individuals as opposed to state officials acting with express or implied governmental authority or under color of law. A corollary of this inquiry is whether the reference to "individuals" in this context means particular natural persons only, or also encompasses organized collective groups and institutions such as ZANU–PF. These questions must be addressed because they implicate the Court's subject matter jurisdiction, the absence of which cannot be waived or ignored.[211] The underlying issue has engendered substantial debate which has not fully resolved the doubts that some courts have expressed.[212] Accordingly, in authorizing the default

judgment against ZANU–PF, this Court feels compelled to consider the threshold substantive question.

As a preliminary matter, it is noteworthy that the default judgment authorized here is rendered not against particular individuals representing ZANU–PF but presumably against the collective entity itself in whatever legal form it exists. This result gives expression to a vital modern reality. Though much of international law reflects the view that only sovereign states are the subjects of international law, entitling only them to invoke rights and possess duties derived from the law of nations, this notion has come increasingly under question.[213] Even classical formulations of the concept admitted exceptions for some private acts committed by individuals, such as genocide, war crimes, piracy and slave trading.[214]

**211.** See Insurance Corp. of Ireland, 456 U.S. at 702, 102 S.Ct. 2099.

**212.** See Kadic, 70 F.3d at 239–45 (holding that certain forms of conduct violate international law "whether undertaken by those acting under the auspices of a state or only as private individuals."); Tel–Oren, 726 F.2d at 791–95 (Edwards, J., concurring) (noting an absence of codification or international consensus on whether torture perpetrated by other than a recognized state or its officials acting under color of state law violates the law of nations, while acknowledging some case law and commentary assuming or urging that private individuals may be the subjects of international law); Nguyen Da Yen v. Kissinger, 528 F.2d 1194, 1201 n. 13 (9th Cir.1975) (in a case against United States officials arising out of the evacuation of certain children from Vietnam and airlifting them to this country during the end of United States involvement in Vietnam, the court noted in dicta that jurisdiction under the ATCA conceivably could exist if the private adoption agencies that participated in the "Babylift" were joined in the action as potential joint tortfeasors); Doe I v. Islamic Salvation Front (FIS), 993 F.Supp. 3, 8 (D.D.C.1998) (finding jurisdiction under the ATCA in an action brought

against an umbrella political organization); Lopes v. Reederei Richard Schroder, 225 F.Supp. 292, 297 (E.D.Pa.1963) (stating that in the context of the ATCA, violation of the law of nations means "at least a violation by one or more individuals"); Adra v. Clift, 195 F.Supp. 857, 864–65 (D.Md.1961) (establishing jurisdiction under the ATCA in a case alleging violation of international law by an individual—misuse of passports to bring into the United States a child involved in a custody battle); see also 1 C. Hyde, International Law Chiefly as Interpreted and Applied by the United States, § 2A, at 4 (2d. ed. rev.1945); Louis B. Sohn, The New International Law: Protection of the Rights of Individuals Rather Than States, 32 Am. U.L.Rev. 1, 9–10 (Fall 1982).

**213.** See Kadic; 70 F.3d at 239–45; Thomas M. Franck, The Empowered Self: Law and Society in the Age of Individualism 196–223 (1999); Sohn, supra note 212, at 1.

**214.** See Kadic, 70 F.3d at 239; Restatement (Third) of Foreign Relations Law, pt. II, Introductory Note ("Individuals may be held liable for offenses against international law, such as piracy, war crimes or genocide.").

More recently, prompted by the wider recognition and assertions of international human rights, the rights and roles of individuals as subjects of international law—as both victims and violators—have assumed greater prominence and have been given broader expression in the development of international norms.[215]

An offshoot of these developments is growing recognition of a reality reflected in the matter now before this Court. Barbaric offenses committed in violation of established international standards do not always spring from spontaneous acts of violence wreaked by random individuals or government agencies. Rather, they sometimes represent the culmination of elaborate schemes devised by expertly-organized and well-financed private groups. These entities give their causes names, banners and emblems for their doctrines and recruits, and bank accounts with which to carry out their inglorious business. The wrongful enterprise may seek political or economic ends and, not uncommonly, as is alleged here, may derive critical nurture and command from the not so invisible hand of the state or from rogue government officials who share the lawless and injurious goals of the particular group or venture and who use the cover of law to promote its private ends. At times, the masterminds and managers who hatch these plans are high-ranking leaders of the state who then employ public and private surrogates to implement their unofficial deeds. Under some circumstances, such

as those prevailing here, the leaders may be eligible to assert some form of official immunity from court jurisdiction, or may otherwise possess the methods and means to escape personal liability for actions carried out by the subordinates used as accomplices and pawns.

██ Like all other civil remedies, the causes of action authorized by the ATCA and TVPA are intended to compensate victims and punish and deter the perpetrators. Were liability in such cases to be limited so as to permit recovery only from the particular natural individuals who actually commit the underlying wrongful acts, the result would effectively nullify the purposes of the statutes. Frequently the role of specified front-line actors in larger conspiracies is merely to execute the plans or follow orders issued by the scheme's leaders and institutional organizers. The lesser participants, though no less responsible, may have the least ability to evade jurisdiction or to satisfy a judgment of liability. Conversely, to exempt the organized perpetrators would allow an escape for actors with primary responsibility, encourage subterfuge and release the only players who may possess the resources to enable collection on any judgment rendered to the victims of the unlawful scheme.

██ Though the courts have not specifically addressed these concerns in the few recorded instances where claims against organized political organizations and other

---

215. *See* Franck, *supra* note 213, at 196–223; Sohn, *supra*, note 212, at 1 ("States have had to concede to ordinary human beings the status of subjects of international law ...."). 
Professor Franck notes that although "[t]he ensuing canon of human rights laws has only partially fulfilled the aspirations of those heady postwar years ... a radical new idea has gained currency: that individuals can hold their governments accountable before an international tribunal applying globally

adopted principles of personal rights." Franck, *supra*, note 213, at 198–206. Furthermore, individuals are asserting their emerging rights in the face of "violations of personal rights that are now formally protected by international law and are judged in accordance with principles of law and legal reasoning, much as if the same issues had been raised before the Supreme Courts of India or the United States." *Id.* at 204.

private entities have been lodged alleging violations of international norms, such claims have been sustained, giving recognition to the application of international law to some conduct of private actors.[216] These cases have entailed the application of widely recognized international human rights standards to impose individual liability on organized non-state actors under two distinct circumstances: (1) when the individuals' deeds are done in concert with governmental officials or with their significant assistance, which thus may be deemed to constitute state action or conduct taken under the color of state law; and (2) when the individuals commit acts independently of any state authority or direction, especially encompassing more egregious conduct, such as genocide, war crimes or other crimes against humanity.[217]

In significant respects, the development of international law in this area parallels the history of sovereign immunity of states, described above, that gave rise to the FSIA and comparable legislation in other countries. These statutes were designed to prevent the abuses associated with states engaging in trade through essentially private corporate entities cloaked with sovereign immunity. Just as under some interpretation and application of the FSIA, individuals acting in official capacities now may be regarded as embodying agencies and instrumentalities of the state, and as such may be entitled to assert sovereign immunity,[218] some non-state entities should be deemed individuals for the purposes of effectively applying statutes like the ATCA and the TVPA that rely upon state action as an element of liability, at least when the private schemes are significantly incubated, aided or carried out in concert with government officials.

### 1. The Alien Tort Claims Act

■ The ATCA confers upon federal district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." [219] Thus, to satisfy subject matter jurisdiction under the ATCA, three conditions must be satisfied: the action must be (1) brought by an alien; (2) alleging a tort; (3) committed in violation of international law.[220] Neither of the first two elements are disputed here: all named Plaintiffs are citizens of Zimbabwe, and the allegations state well-recognized torts. It is the nature and scope of the third element which require closer legal scrutiny. The ATCA, unlike the TVPA, does not explicitly require that the wrongful conduct be carried out under actual or apparent authority or color of law of a foreign state.[221] Nonetheless, whether

---

216. *See, e.g., Islamic Salvation Front*, 993 F.Supp. at 8 (upholding a claim against an umbrella organization of extremist Islamic groups opposed to the governing military regime in Algeria and accused of instigating a campaign of atrocities against women and political opponents); *Doe I v. Unocal Corp.*, 963 F.Supp. 880, 890–92 (C.D.Cal.1997) (sustaining a claim under the ATCA brought against a private corporation that entered a joint venture with state actors to develop a commercial project employing forced labor); *Adra*, 195 F.Supp. at 864–65; *see also Klinghoffer*, 937 F.2d at 54; *but cf. Tel–Oren*, 726 F.2d at 792 (Edward, J., concurring).

217. *See generally Kadic*, 70 F.3d at 239–40; *see also* Ronald C. Slye, *International Law, Human Rights Beneficiaries, and South Africa: Some Thoughts on the Utility of International Human Rights Law*, 2 Chi. J. Int'l L. 59, 70 (Spring 2001).

218. *See supra* notes 95–98 and accompanying text.

219. 28 U.S.C. § 1350.

220. *See Kadic*, 70 F.3d at 238.

221. *See id.* at 239, 241; *Islamic Salvation* 993 F.Supp. at 3–9.

such a requirement exists as a matter of customary international law and therefore constitutes a corollary condition to satisfy subject matter jurisdiction in an action under the ATCA has been the subject of significant debate.[222]

In applying the ATCA to allegations of official torture, the Second Circuit in *Filartiga* declared: "Thus it is clear that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." [223] In *Kadic*, addressing the evolution of related principles fifteen years after *Filartiga*, the Circuit Court reaffirmed this instruction.[224] There, the court rejected the notion "that the law of nations, as understood in the modern era, confines its reach to state action," and ruled instead that "certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." [225]

The Second Circuit then held that among the specific acts which violate contemporary international norms, whether committed by state officials or private individuals, are genocide and war crimes. With regard to torture and summary execution, the court declared that, when not perpetrated in the course of genocide or war crimes, these acts are proscribed by international law only when committed by state officials or under the color of law.[226] In this connection, the Court instructed that applicable principles from the juris-

prudence of § 1983 of the Civil Rights Act[227] should guide the courts in reaching those determinations.

■ In the case at bar, the complaint alleges that, acting under Mugabe's command and control, ZANU–PF officials inflicted a "brutal campaign of murder, torture, terrorism, rape, beatings, and destruction of property against Zimbabwean citizens and residents suspected of supporting the opposition political party . . . ." [228] The mission of terror was specifically designed to perpetuate Mugabe's rule and secure the dominant position of power held by ZANU–PF in the executive and legislative branches of Zimbabwe's government since 1980.[229] The complaint avers that the deliberate and systematic wrongs alleged were inflicted with the participation and assistance of the Zimbabwe military, Central Intelligence Organization, Republic Police and the Zimbabwe War Veterans Associations ("ZWVA").

More specifically, Plaintiffs claim that ZANU–PF "has relied on its position as the unrivaled and dominant force in the Government to illegally direct and force the military and police to assist in the unlawful activities of ZANU–PF and ZWVA." [230] According to the complaint, for example, ZANU–PF employed government officials and other public resources in its unlawful activities. The party allegedly engaged and paid the ZWVA and its oper-

---

**222.** *See Kadic,* 70 F.3d at 238–40; *Tel–Oren,* 726 F.2d at 791–95 (Edwards, J., concurring); *Islamic Salvation Front,* 993 F.Supp. at 7–8.

**223.** *See* 630 F.2d at 881 (citing *Ware v. Hylton,* 3 U.S. (3 Dall.) 199, 1 L.Ed. 568 (1796)); *see also Tel–Oren,* 726 F.2d at 777 ("[T]he 'law of nations' is not stagnant and should be construed as it exists today among the nations of the world.").

**224.** *See* 70 F.3d at 239.

**225.** *Id.*

**226.** *See id.* at 243–45.

**227.** 42 U.S.C. § 1983.

**228.** Compl. ¶ 15.

**229.** *Id.* at ¶¶ 15, 19.

**230.** *Id.* at ¶ 17.

atives $20 million to form an organized force of armed militias charged with invading and occupying the land of ZANU–PF's political opponents, especially targeting white farmers.[231] These farm occupations resulted in thousands of recorded incidents of violence in the course of which, while police looked on and took no action, some Plaintiffs suffered physical attacks or their relatives were killed.[232] Plaintiffs assert that ZANU–PF's violent movement employed other Zimbabwe government equipment and facilities, such as transportation, communications and coordination, and, at Mugabe's behest, was placed under the command of Zimbabwe's Head of the Air Force.[233]

These accusations amply demonstrate that ZANU–PF did not consist merely of loosely connected, haphazardly organized individuals, or a misguided mob of marauders randomly roving and unleashing terror throughout Zimbabwe. Rather, Plaintiffs' factual assertions and supporting evidence suggest that in carrying out the drive of organized violence and methodic terror portrayed here ZANU–PF worked in tandem with Zimbabwe government officials, under whose direction or control many of the wrongful acts were conceived and executed. On the facts presented, ZANU–PF thus became an integral arm of the state through which its apparent power extended to the wrong-

doers. Accordingly, the Court concludes that Plaintiffs' claims allege conduct taken by ZANU–PF in concert with Zimbabwe officials or with significant assistance from state resources sufficient, under *Kadic's* instruction,[234] to satisfy the standard of what constitutes involvement by government officials in the conduct of non-state actors. Plaintiffs' allegations and related evidence support the "color of law" and state action requirements for the purposes of Plaintiffs' action against ZANU–PF under the ATCA.[235]

### 2. *The Torture Victim Protection Act*

■ The TVPA recognizes a cause of action for victims of official torture and extrajudicial killing against "[a]n individual ... [acting] under actual or apparent authority, or color of law, of any foreign nation ...." [236] While the statute creates a cause of action, it does not itself, unlike the ATCA, confer federal court jurisdiction.[237] A victim seeking to exercise the right to sue established by the statute must rely upon a grant of federal jurisdiction provided in some other enactment, most notably the ATCA itself.[238]

■ The TVPA's legislative history confirms that the state action condition was intended to make clear that a plaintiff "must establish some governmental involvement in the torture or killing to prove

---

231. *Id.* at ¶ 44.

232. *Id.* at ¶¶ 5, 12.

233. *Id.* at ¶ 47.

234. *See Kadic,* 70 F.3d at 244–45.

235. *See id.; see also Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 942, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) ("The State has so far insinuated itself into a position of interdependence with [the defendant] that it must be recognized as a joint participant in the chal-

lenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment."); *Jensen v. Farrell Lines, Inc.,* 625 F.2d 379, 382 (2d Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981).

236. 28 U.S.C. § 1350 Note, at § 2(a).

237. *See Kadic,* 70 F.3d at 246.

238. *See id.*

a claim" and that the statute "does not attempt to deal with torture or killing by purely private groups." [239] The state action requirement was underscored by the Second Circuit in *Kadic*, where the court stated that torture and summary execution "are proscribed by international law only when committed by state officials or under color of law." [240] The Circuit Court there also provided guidance with regard to the interpretation of the TVPA's state action or color of law requirement that mirrors the court's analysis and application of the ATCA. It instructed that in construing the terms "actual or apparent authority" and "color of law", principles of agency law and the jurisprudence under § 1983 of the Civil Rights Act [241] would serve as a relevant guide. To this end, the court recognized that private individuals may act under color of law for TVPA purposes when they act in concert with state officials or with significant state aid.[242]

 The underlying unlawful and injurious campaign carried out by ZANU–PF, as described above, allegedly employed government equipment and facilities such as transportation, communications and coordination, and were under the command of Zimbabwe's Air Force at the behest of Mugabe.[243] Plaintiffs' assertions of involvement or significant assistance by high-ranking Zimbabwe government officials in ZANU–PF's campaign of torture and summary killings that form the basis for the color of law element of Plaintiffs' claim under the ATCA also serve to satisfy the jurisdictional prerequisite as regards their TVPA cause of action. Accordingly, the Court concludes that Plaintiffs have established subject matter jurisdiction for their claim against ZANU–PF under the TVPA and that Plaintiffs' motion for entry of default judgement against ZANU–PF should be granted on this ground as well.

## V. CONCLUSION

This analysis ends on a mixed note. The Court is not unmindful of the enormity of the atrocities Plaintiffs so movingly and vividly portray. After depicting the "sustained campaign of murder, violence, intimidation and harassment by President Mugabe and the ruling ZANU–PF Party" against political opponents and others, Plaintiffs deplore that the State Department's honoring of the defendants' assertion of immunity "does not dispute that the plaintiffs have suffered extrajudicial killing and torture in violation of international law, but it tells the Court that, in this case, immunity trumps justice." [244]

But Plaintiffs' eloquence alone does not equate to law. Nor, regrettably, is the law always as eloquent as we may wish it to be, especially when its outcomes may not comport with our own conception of the ideal. Certainly, torture, extrajudicial killings and other forms of deliberate brutality, anytime, anywhere, pierce the inner core of human baseness and cross the outer crusts of infamy. And if such a thing could be conceived—as the void that one step beyond infinity would occupy—that already vast barbarism and disgrace could be surpassed, the limit may exist where

---

**239.** *Kadic,* 70 F.3d at 245 (citing H.R.Rep. No. 102–367, 102d Cong., at 5 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 87).

**240.** *Id.* at 243 (citing the Convention Against Torture, pt. I, art 1) (defining torture as "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity").

**241.** *See* 42 U.S.C. § 1983.

**242.** *See Kadic,* 70 F.3d at 245–46 (citing *Lugar,* 457 U.S. at 937, 102 S.Ct. 2744).

**243.** *See* Compl. ¶ 47.

**244.** Plaintiffs' Brief, at 7, 9.

conditions prevail such as those asserted here: where misdeeds imbued with such profound depravity are committed against innocents among their own people by the highest leaders of the state.

Not infrequently courts confront events that cry out loudly for immediate justice. And sometimes those occasions make the judges feel that their hands are tied by demands exerting more compelling pressures and pulls that also define justice, though some other way not always to everybody's liking. Instances like these rank among the most trying moments of judicial experience. At a hand-wringing and heartrending point just such as this, another court observed that "[t]he FSIA is absolute in this regard, no matter how heinous the alleged illegalities." [245] That remark sounds a harsh note. It seems unfitting for the moment, even if extenuation somehow could impart comfort to another person, or ease one's own qualms and constraints. But the point is not the severity of the judgment.

The purpose of diplomatic and head-of-state immunity is not to cover up heinous deeds from coming to the light of day, or to protect a nation's leaders from accountability for their acts and, by shielding them from reprisals, tacitly condone their wrongs. If there is a larger end here to be served, for which accusations of grave misconduct as between particular individuals may be momentarily set aside, it is in the interest of comity among nations—to safeguard friendly relations among sovereign states.

This is a value judgment sovereigns make and honor mutually, each leaving to their own domestic methods—and to any measures permissible under customary international rules—the time and the means to guide the advent of the day of reckoning for the sovereign leader's wrongs: when and how that justice deferred is to be judged. And so, for Plaintiffs here, if their accusations are true, all is not lost. There is a lesson to be learned both from recent events and from the course of the law in this area, as *Marcos, Kadic, Filartiga* and other recent cases illustrate, and as the even more contemporaneous experiences of Augusto Pinochet and Slobodan Milosevic confirm. These precedents instruct that resort to head-of-state and diplomatic immunity as a shield for private abuses of the sovereign's office is wearing thinner in the eyes of the world and waning in the cover of the law. The prevailing trend teaches that the day does come to pass when those who violate their public trust are called upon, in this world, to render account for the wrongs they inflict on innocents.

In the meantime, however, in the balancing of larger public values and priorities, individual claims sometimes unavoidably and regrettably end up with the shorter weight. But until that more opportune day arrives, these are choices that, as between sovereigns, in the interest of comity among nations and in the context of uni-

---

**245.** *Herbage,* 747 F.Supp. at 67; *see also Sabbatino,* 376 U.S. at 436–37, 84 S.Ct. 923 ("However offensive to the public policy of this country and its constituent States an expropriation of this kind may be, we conclude that both the national interest and progress toward the goal of establishing the rule of law among nations are best served by maintaining intact the act of state doctrine in this realm of its application."); *Underhill v. Hernandez,* 168 U.S. 250, 253, 18 S.Ct. 83, 42 L.Ed. 456 (1897) ("It is idle to argue that the proceedings of those who triumphed [in a political revolution] should be treated as the acts of banditti, or mere mobs."); *Alicog,* 860 F.Supp. at 385 ("The courts cannot invade the executive and legislative prerogative by keeping cases alive that fall within the discretionary function exception, even if they contain scandalous allegations of multiple wrongs.").

versally accepted principles governing relations among states, sovereign nations are entitled to make unhindered by the second-guesses of their courts.

Not to conclude on an unduly dour tone, the Court offers a final comment. In guiding the growth of common law, it is well to keep in mind that we would not be true to the task nor rise to its multiple challenges were we to ignore the world and the times we live in. Today, events around us bear witness almost daily to the destructive power of individuals whose chosen way of life is to do wrong by inflicting harms of mass proportions. With modern means, the hands of one or a few persons hold the force sufficient to wreak in moments wanton devastation and horror of a magnitude that it once took whole armies to inflict. The response through the rule of law to such large acts of terror has lessons useful to recall, by the wisdom of which this Court has sought to steer the judgment it renders today.

Generally evil works by stealth and craft. It has many guiles and guises. It employs an ever-larger arsenal of lawless methods and devices. To iniquity's purpose of propagating large-scale grief, as evidenced in the case at hand, its capacity for injustice is virtually limitless because it honors none of the self-imposed restraints that contain the conduct of the civilized world within decent bounds. It is well to consider also that justice and injustice, paired like strands of life, normally travel hand in hand, their union joined in direct proportion. Every injustice gives rise to a call for justice that expands to the limits of the injuries suffered or perceived. The greater the wrong, the louder the cry for right to be requited.

In the light of these observations, the vanguard of the law should stand ready to adapt as appropriate, to shape redress and remedy so as to answer measure for mea-

sure the particular evil it pursues. Yet, while remaining no less resilient and resourceful than its counterpoise, the pathway of justice must always be mindful of the affirmative values it protects and the perils it guards against. Like the contours and relation of hand and glove, justice must stay outside and above the evil it encloses, while not becoming a part of it. This prompting reflects not just an act of self-preservation, but a reaffirmation of a principle embodied in our legal system that prominently stands out and has long held us in good stead: that survival itself is worth all the more when its end point is grounded on rules that are right, reasoned and just.

### ORDER

For the reasons discussed above, it is hereby

**ORDERED** that Plaintiffs' motion for entry of a default judgment against defendants Mugabe and Mudenge is denied; and it is further

**ORDERED** that Plaintiffs' claims against Mugabe, Mudenge and Moyo are dismissed; and it is further

**ORDERED** that Plaintiffs' motion for entry of a default judgment against defendant ZANU–PF is granted; and it is finally

**ORDERED** that this matter be referred to the designated Magistrate Judge for an inquest on damages arising from the liability determined herein relating to defendant ZANU–PF.

**SO ORDERED.**